SUTER ET AL. *v.* ARTIST M. ET AL.

No. 90–1488.   Argued December 2, 1991—Decided March 25, 1992

REHNQUIST, C. J., delivered the opinion of the Court, in which WHITE, O'CONNOR, SCALIA, KENNEDY, SOUTER, and THOMAS, JJ., joined. BLACK-MUN, J., filed a dissenting opinion, in which STEVENS, J., joined, *post*, p. 364.

*Christina M. Tchen,* Special Assistant Attorney General of Illinois, argued the cause for petitioners. With her on

the briefs were *Susan Getzendanner, Charles F. Smith,* and *Kimberley K. Baer,* Special Assistant Attorneys General.

*Deputy Solicitor General Roberts* argued the cause for the United States as *amicus curiae* urging reversal. With him on the brief were *Solicitor General Starr, Assistant Attorney General Gerson, Michael R. Dreeben,* and *Anthony J. Steinmeyer.*

*Michael G. Dsida* argued the cause for respondents. With him on the brief were *Patrick T. Murphy* and *Lee Ann Lowder.**

---

*Briefs of *amici curiae* urging reversal were filed for the State of Louisiana et al. by *William J. Guste, Jr.,* Attorney General of Louisiana, and *Jesse James Marks* and *David A. Dalia,* Assistant Attorneys General, *James H. Evans,* Attorney General of Alabama, *Grant Woods,* Attorney General of Arizona, *Daniel E. Lungren,* Attorney General of California, *Gale A. Norton,* Attorney General of Colorado, *Charles M. Oberly III,* Attorney General of Delaware, *John Payton,* Corporation Counsel of the District of Columbia, *Michael J. Bowers,* Attorney General of Georgia, *Warren Price III,* Attorney General of Hawaii, *Larry EchoHawk,* Attorney General of Idaho, *Linley E. Pearson,* Attorney General of Indiana, *Bonnie J. Campbell,* Attorney General of Iowa, *Robert T. Stephan,* Attorney General of Kansas, *Frederic J. Cowan,* Attorney General of Kentucky, *Michael E. Carpenter,* Attorney General of Maine, *J. Joseph Curran, Jr.,* Attorney General of Maryland, *Scott Harshbarger,* Attorney General of Massachusetts, *Frank J. Kelley,* Attorney General of Michigan, *Hubert H. Humphrey III,* Attorney General of Minnesota, *Mike Moore,* Attorney General of Mississippi, *William L. Webster,* Attorney General of Missouri, *Marc Racicot,* Attorney General of Montana, *Frankie Sue Del Papa,* Attorney General of Nevada, *Robert J. Del Tufo,* Attorney General of New Jersey, *Tom Udall,* Attorney General of New Mexico, *Lacy H. Thornburg,* Attorney General of North Carolina, *Nicholas J. Spaeth,* Attorney General of North Dakota, *Lee Fisher,* Attorney General of Ohio, *Susan Brimer Loving,* Attorney General of Oklahoma, *Dave Frohnmayer,* Attorney General of Oregon, *Ernest D. Preate, Jr.,* Attorney General of Pennsylvania, *James E. O'Neil,* Attorney General of Rhode Island, *T. Travis Medlock,* Attorney General of South Carolina, *Mark W. Barnett,* Attorney General of South Dakota, *Paul Van Dam,* Attorney General of Utah, *Jan C. Graham,* Solicitor General, *Jeffrey L. Amestoy,* Attorney General of Vermont, *Mary Sue Terry,* Attorney General of Virginia, *Ken Eikenberry,* Attorney General

CHIEF JUSTICE REHNQUIST delivered the opinion of the Court.

This case raises the question whether private individuals have the right to enforce by suit a provision of the Adoption Assistance and Child Welfare Act of 1980 (Adoption Act or Act), 94 Stat. 500, 42 U. S. C. §§ 620–628, 670–679a, either under the Act itself or through an action under 42 U. S. C. § 1983.[1] The Court of Appeals for the Seventh Circuit held that 42 U. S. C. § 671(a)(15) contained an implied right of action, and that respondents could enforce this section of the Act through an action brought under § 1983 as well. We hold that the Act does not create an enforceable right on behalf of respondents.

The Adoption Act establishes a federal reimbursement program for certain expenses incurred by the States in ad-

of Washington, and *Mario J. Palumbo*, Attorney General of West Virginia; and for the Council of State Governments et al. by *Richard Ruda* and *Charles Rothfeld.*

Briefs of *amici curiae* urging affirmance were filed for the American Association for Protecting Children et al. by *James D. Weill* and *Robert G. Schwartz;* for the American Bar Association by *Talbot S. D'alemberte;* for the Illinois State Bar Association et al. by *Robert E. Lehrer, Dennis A. Rendleman, Roger B. Derstine, Richard L. Mandel, John J. Casey, Michael A. O'Connor, Alexander Polikoff, Roslyn C. Lieb, Gary H. Palm,* and *Thomas F. Geraghty;* and for the National Association of Counsel for Children et al. by *Christopher A. Hansen, John A. Powell, Harvey M. Grossman, Ira A. Burnim, Henry Weintraub, Martha Bergmark,* and *Mark Soler.*

*Kenneth C. Bass III, Thomas J. Madden,* and *Jeffrey Kuhn* filed a brief for the National Council of Juvenile and Family Court Judges as *amicus curiae.*

[1] Section 1983 provides, in relevant part: "Every person who, under color of any statute, ordinance, regulation, custom, or usage, of any State or Territory or the District of Columbia, subjects or causes to be subjected, any citizen of the United States or other person within the jurisdiction thereof to the deprivation of any rights, privileges, or immunities, secured by the Constitution and laws shall be liable to the party injured in an action at law, suit in equity, or other proper proceeding for redress."

ministering foster care and adoption services. The Act provides that States will be reimbursed for a percentage of foster care and adoption assistance payments when the State satisfies the requirements of the Act. 42 U. S. C. §§ 672–674, 675(4)(A) (1988 ed. and Supp. I).

To participate in the program, States must submit a plan to the Secretary of Health and Human Services for approval by the Secretary. §§ 670, 671. Section 671 lists 16 qualifications which state plans must contain in order to gain the Secretary's approval. As relevant here, the Act provides:

"(a) Requisite features of State plan
"In order for a State to be eligible for payments under this part, it shall have a plan approved by the Secretary which—

.     .     .     .     .

"(3) provides that the plan shall be in effect in all political subdivisions of the State, and, if administered by them, be mandatory upon them;

.     .     .     .     .

"(15) effective October 1, 1983, provides that, in each case, reasonable efforts will be made (A) prior to the placement of a child in foster care, to prevent or eliminate the need for removal of the child from his home, and (B) to make it possible for the child to return to his home . . . ." §§ 671(a)(3), (15).

Petitioners in this action are Sue Suter and Gary T. Morgan, the Director and the Guardianship Administrator, respectively, of the Illinois Department of Children and Family Services (DCFS). DCFS is the state agency responsible for, among other things, investigating charges of child abuse and neglect and providing services to abused and neglected children and their families. DCFS is authorized under Illinois law, see Ill. Rev. Stat., ch. 37, ¶ 802–1 et seq. (1989), to gain temporary custody of an abused or neglected child after a

hearing and order by the Juvenile Court. Alternatively, the court may order that a child remain in his home under a protective supervisory order entered against his parents. See *Artist M.* v. *Johnson,* 917 F. 2d 980, 982–983 (CA7 1990). Once DCFS has jurisdiction over a child either in its temporary custody, or in the child's home under a protective order, all services are provided to the child and his family by means of an individual caseworker at DCFS to whom the child's case is assigned. App. 35–39.

Respondents filed this class-action suit seeking declaratory and injunctive relief under the Adoption Act.[2] They alleged that petitioners, in contravention of 42 U. S. C. § 671(a)(15), failed to make reasonable efforts to prevent removal of children from their homes and to facilitate reunification of families where removal had occurred.[3] This failure occurred, as alleged by respondents, because DCFS failed promptly to assign caseworkers to children placed in DCFS custody and promptly to reassign cases when caseworkers were on leave from DCFS. App. 6–8. The District Court, without objection from petitioners, certified two separate classes seeking relief, including all children who are or will be wards of DCFS and are placed in foster care or remain in their homes under a judicial protective order.[4] *Artist M.* v.

---

[2] Count III of the complaint alleged that petitioners violated the Due Process Clause of the Constitution. App. 26. This count was dismissed by the District Court and was not appealed. *Artist M.* v. *Johnson,* 917 F. 2d 980, 982, n. 3 (CA7 1990).

[3] Although DCFS administers the child welfare program for the entire State of Illinois, respondents only alleged violations of the Adoption Act as to Cook County. App. 6.

[4] Specifically, the following classes were certified by the District Court: "Class A: Children who are or will be the subjects of neglect, dependency or abuse petitions filed in the Circuit Court of Cook County, Juvenile Division ('Juvenile Court'), who are or will be in the custody of [DCFS] or in

*Johnson,* 726 F. Supp. 690, 691 (ND Ill. 1989). The District Court denied a motion to dismiss filed by petitioners, holding, as relevant here, that the Adoption Act contained an implied cause of action and that suit could also be brought to enforce the Act under 42 U. S. C. § 1983. 726 F. Supp., at 696, 697.

The District Court then entered an injunction requiring petitioners to assign a caseworker to each child placed in DCFS custody within three working days of the time the case is first heard in Juvenile Court, and to reassign a caseworker within three working days of the date any caseworker relinquishes responsibility for a particular case. App. to Pet. for Cert. 56a. The 3-working-day deadline was found by the District Court to "realistically reflec[t] the institutional capabilities of DCFS," *id.,* at 55a, based in part on petitioners' assertion that assigning caseworkers within that time frame "would not be overly burdensome." *Id.,* at 54a. The District Court, on partial remand from the Court of Appeals, made additional factual findings regarding the nature of the delays in assigning caseworkers and the progress of DCFS reforms at the time the preliminary injunction was entered. App. 28–50.

The Court of Appeals affirmed. 917 F. 2d 980 (CA7 1990). Relying heavily on this Court's decision in *Wilder* v. *Virginia Hospital Assn.,* 496 U. S. 498 (1990), the Court of Ap-

---

a home under DCFS supervision by an order of Juvenile Court and who are now or will be without a DCFS caseworker for a significant period of time.

"Class B: Children who are or will be the subjects of neglect, dependency or abuse petitions filed in Juvenile Court who are or will be placed in DCFS' custody and who are or will be without a DCFS caseworker for a significant period of time." *Artist M.* v. *Johnson,* 726 F. Supp. 690, 691 (ND Ill. 1989).

The "Class B" plaintiffs only raised a constitutional due process claim, which was dismissed by the District Court. See n. 2, *supra.*

peals held that the "reasonable efforts" clause of the Adoption Act could be enforced through an action under § 1983. 917 F. 2d, at 987–989.[5] That court, applying the standard established in *Cort* v. *Ash*, 422 U. S. 66 (1975), also found that the Adoption Act created an implied right of action such that private individuals could bring suit directly under the Act to enforce the provisions relied upon by respondents. 917 F. 2d, at 989–991. We granted certiorari, 500 U. S. 915 (1991), and now reverse.[6]

---

[5] The Court of Appeals also noted that the Fourth Circuit, in *L. J. ex rel. Darr* v. *Massinga*, 838 F. 2d 118 (1988), cert. denied, 488 U. S. 1018 (1989), had found the substantive requirements listed in § 671(a) to be enforceable under § 1983. 917 F. 2d, at 988.

Several cases have addressed the enforceability of various sections of the Adoption Act. See, *e. g., Massinga, supra,* at 123 (finding case plan requirements enforceable under § 1983); *Lynch* v. *Dukakis,* 719 F. 2d 504 (CA1 1983) (same); *Norman* v. *Johnson,* 739 F. Supp. 1182 (ND Ill. 1990) (finding "reasonable efforts" clause enforceable under § 1983); *B. H.* v. *Johnson,* 715 F. Supp. 1387, 1401 (ND Ill. 1989) (finding "reasonable efforts" clause not enforceable under § 1983).

[6] Subsequent to oral argument, respondents notified the Court of the entry of a consent decree in the case of *B. H.* v. *Suter,* No. 88–C 5599 (ND Ill.), which they suggest may affect our decision on the merits, or indeed may make the instant action moot. We find no merit to respondents' contentions, and conclude that the *B. H.* consent decree has no bearing on the issue the Court decides today. Sue Suter, petitioner in this case, is the defendant in the *B. H.* suit, which alleges statewide deficiencies in the operations of DCFS. See *B. H.* v. *Johnson, supra.* The class approved in *B. H.* contains "all persons who are or will be in the custody of [DCFS] and who have been or will be placed somewhere other than with their parents." 715 F. Supp., at 1389.

Respondents suggest that because petitioner has agreed in the *B. H.* consent decree to provide "reasonable efforts" to maintain and reunify families, she is somehow precluded from arguing in this case that § 671(a)(15) does not grant a right for individual plaintiffs to enforce that section by suit. As we have recognized previously this Term, however, parties may agree to provisions in a consent decree which exceed the requirements of federal law. *Rufo* v. *Inmates of Suffolk County Jail,* 502 U. S. 367, 389 (1992). Paragraph two of the *B. H.* decree itself provides that the decree is not an admission of any factual or legal issue. In addi-

In *Maine* v. *Thiboutot*, 448 U. S. 1 (1980), we first established that § 1983 is available as a remedy for violations of federal statutes as well as for constitutional violations. We have subsequently recognized that § 1983 is not available to enforce a violation of a federal statute "where Congress has foreclosed such enforcement of the statute in the enactment

---

tion, the *B. H.* consent decree does not require "reasonable efforts" with no further definition, but rather defines the standard against which those efforts are to be measured. See *B. H.* Consent Decree ¶¶ 8, 16(a), pp. 12, 20. Thus, the agreement embodied in the consent decree is not inconsistent with the position petitioner asserts here, namely, that § 671(a)(15) requiring "reasonable efforts," without further definition, does not create an enforceable right on behalf of respondents to enforce the clause by suit.

Respondents next contend that the *B. H.* decree "may also render much of this case moot." Supp. Brief for Respondents 8. Although petitioner here is the defendant in *B. H.*, the class certified in *B. H.* does not include children living at home under a protective order, and therefore is more narrow than the class certified in the instant suit. In addition, while DCFS agrees in the *B. H.* consent decree to certain obligations, for example, a ceiling on the number of cases handled by each caseworker, none of these obligations subsumes the injunction entered by the District Court and affirmed by the Court of Appeals below, requiring petitioners to provide a caseworker within three days of when a child is first removed from his home. Cf. *Johnson* v. *Board of Ed. of Chicago*, 457 U. S. 52 (1982) *(per curiam)*.

In short, the situation in this case is quite different from that in the cases cited by respondents in which this Court remanded for further proceedings after events subsequent to the filing of the petition for certiorari or the grant of certiorari affected the case before the Court. Unlike the parties in *J. Aron & Co.* v. *Mississippi Shipping Co.*, 361 U. S. 115 (1959) *(per curiam)*, the parties in the case before the Court have not entered a consent decree. Unlike *Kremens* v. *Bartley*, 431 U. S. 119 (1977), the *B. H.* decree does nothing to change the class at issue or the claims of the named class members. And unlike *American Foreign Service Assn.* v. *Garfinkel*, 490 U. S. 153 (1989) *(per curiam)*, where we noted that "[e]vents occurring since the District Court issued its ruling place this case in a light far different from the one in which that court considered it," *id.*, at 158, the issue whether the reasonable efforts clause creates an enforceable right on behalf of respondents is the same now as it was when decided by the District Court below.

itself and where the statute did not create enforceable rights, privileges, or immunities within the meaning of § 1983." *Wright* v. *Roanoke Redevelopment and Housing Authority,* 479 U. S. 418, 423 (1987).

In *Pennhurst State School and Hospital* v. *Halderman,* 451 U. S. 1 (1981), we held that § 111 of the Developmentally Disabled Assistance and Bill of Rights Act of 1975, 42 U. S. C. § 6010 (1976 ed. and Supp. III), did not confer an implied cause of action. That statute, as well as the statute before us today, was enacted by Congress pursuant to its spending power.[7] In *Pennhurst,* we noted that it was well established that Congress has the power to fix the terms under which it disburses federal money to the States. 451 U. S., at 17, citing *Oklahoma* v. *United States Civil Service Comm'n,* 330 U. S. 127 (1947); *Rosado* v. *Wyman,* 397 U. S. 397 (1970). As stated in *Pennhurst:*

> "The legitimacy of Congress' power to legislate under the spending power thus rests on whether the State voluntarily and knowingly accepts the terms of the 'contract.' There can, of course, be no knowing acceptance if a State is unaware of the conditions or is unable to ascertain what is expected of it. Accordingly, if Congress intends to impose a condition on the grant of federal moneys, it must do so unambiguously." 451 U. S., at 17 (citations and footnote omitted).

We concluded that the statutory section sought to be enforced by the *Pennhurst* respondents did not provide such unambiguous notice to the States because it spoke in terms "intended to be hortatory, not mandatory." *Id.,* at 24.

In *Wright,* the Brooke Amendment to existing housing legislation imposed a ceiling on the rent which might be charged low-income tenants living in public housing projects.

---

[7] Article I, § 8, cl. 1, of the Constitution contains the spending power, which provides, "Congress shall have Power to . . . provide for the . . . general Welfare of the United States."

The regulations issued by the Department of Housing and Urban Development in turn defined rent to include "'a reasonable amount for [use of] utilities,'" and further defined how that term would be measured. *Wright, supra,* at 420–421, n. 3. We held that tenants had an enforceable right to sue the Housing Authority for utility charges claimed to be in violation of these provisions. In *Wilder,* 496 U. S., at 503, the Boren Amendment to the Medicaid Act required that Medicaid providers be reimbursed according to rates that the "'State finds, and makes assurances satisfactory to the Secretary,'" are "'reasonable and adequate'" to meet the costs of "'efficiently and economically operated facilities.'" Again, we held that this language created an enforceable right, on the part of providers seeking reimbursement, to challenge the rates set by the State as failing to meet the standards specified in the Boren Amendment.

In both *Wright* and *Wilder* the word "reasonable" occupied a prominent place in the critical language of the statute or regulation, and the word "reasonable" is similarly involved here. But this, obviously, is not the end of the matter. The opinions in both *Wright* and *Wilder* took pains to analyze the statutory provisions in detail, in light of the entire legislative enactment, to determine whether the language in question created "enforceable rights, privileges, or immunities within the meaning of § 1983." *Wright, supra,* at 423. And in *Wilder,* we caution that "'[s]ection 1983 speaks in terms of "*rights,* privileges, or immunities," not violations of federal law.'" *Wilder, supra,* at 509, quoting *Golden State Transit Corp.* v. *Los Angeles,* 493 U. S. 103, 106 (1989).

Did Congress, in enacting the Adoption Act, unambiguously confer upon the child beneficiaries of the Act a right to enforce the requirement that the State make "reasonable efforts" to prevent a child from being removed from his home, and once removed to reunify the child with his family? We turn now to that inquiry.

As quoted above, 42 U. S. C. § 671(a)(15) requires that to obtain federal reimbursement, a State have a plan which "provides that, in each case, reasonable efforts will be made . . . to prevent or eliminate the need for removal of the child from his home, and . . . to make it possible for the child to return to his home . . . ." As recognized by petitioners, respondents, and the courts below, the Act is mandatory in its terms. However, in the light shed by *Pennhurst*, we must examine exactly what is required of States by the Act. Here, the terms of § 671(a) are clear: "In order for a State to be eligible for payments under this part, it shall have a plan approved by the Secretary." Therefore the Act does place a requirement on the States, but that requirement only goes so far as to ensure that the State have a plan approved by the Secretary which contains the 16 listed features.[8]

Respondents do not dispute that Illinois in fact has a plan approved by the Secretary which provides that reasonable efforts at prevention and reunification will be made. Tr. of Oral Arg. 29–30.[9] Respondents argue, however, that § 1983

---

[8] Contrary to respondents' assertion that finding 42 U. S. C. § 671(a) to require only the filing of a plan for approval by the Secretary would add a new "prerequisite for the existence of a right under § 1983," Brief for Respondents 22, n. 6, our holding today imposes no new "prerequisites" but merely counsels that each statute must be interpreted by its own terms.

[9] The state plan filed by Illinois relies on a state statute and DCFS internal rules to meet the "reasonable efforts" requirement. Department of Health and Human Services, Office of Human Development Services Administration for Children, Youth and Families, Children's Bureau, State Plan for Title IV–E of the Social Security Act Foster Care and Adoption Assistance, State Illinois 2–13 (1988).

The Illinois statute to which the plan refers imposes a requirement that before temporary custody may be ordered, the court must find that reasonable efforts have been made or good cause has been shown why "reasonable efforts cannot prevent or eliminate the necessity of removal of the minor from his or her home." Ill. Rev. Stat., ch. 37, ¶ 802–10(2) (1989). The statute further provides: "The Court shall require documentation by representatives of [DCFS] or the probation department as to the reason-

allows them to sue in federal court to obtain enforcement of this particular provision of the state plan. This argument is based, at least in part, on the assertion that 42 U. S. C. § 671(a)(3) requires that the State have a plan which is "in effect." This section states that the state plan shall "provid[e] that the plan shall be in effect in all political subdivisions of the State, and, if administered by them, be mandatory upon them." But we think that "in effect" is directed to the requirement that the plan apply to all political subdivisions of the State, and is not intended to otherwise modify the word "plan."[10]

In *Wilder*, the underlying Medicaid legislation similarly required participating States to submit to the Secretary of Health and Human Services a plan for medical assistance describing the State's Medicaid program. But in that case we held that the Boren Amendment actually required the States to adopt reasonable and adequate rates, and that this obligation was enforceable by the providers. We relied in part on the fact that the statute and regulations set forth in some detail the factors to be considered in determining the methods for calculating rates. *Wilder*, 496 U. S., at 519, n. 17.

In the present case, however, the term "reasonable efforts" to maintain an abused or neglected child in his home,

---

able efforts that were made to prevent or eliminate the necessity of removal of the minor from his or her home, and shall consider the testimony of any person as to those reasonable efforts." *Ibid.*

[10] Respondents also based their claim for relief on 42 U. S. C. § 671(a)(9) which states that the state plan shall "provid[e] that where any agency of the State has reason to believe that the home or institution in which a child resides whose care is being paid for in whole or in part with funds provided under this part or part B of this subchapter is unsuitable for the child because of the neglect, abuse, or exploitation of such child, it shall bring such condition to the attention of the appropriate court or law enforcement agency . . . ."

As this subsection is merely another feature which the state plan must include to be approved by the Secretary, it does not afford a cause of action to the respondents anymore than does the "reasonable efforts" clause of § 671(a)(15).

or return the child to his home from foster care, appears in quite a different context. No further statutory guidance is found as to how "reasonable efforts" are to be measured. This directive is not the only one which Congress has given to the States, and it is a directive whose meaning will obviously vary with the circumstances of each individual case. How the State was to comply with this directive, and with the other provisions of the Act, was, within broad limits, left up to the State.

Other sections of the Act provide enforcement mechanisms for the "reasonable efforts" clause of 42 U. S. C. § 671(a)(15). The Secretary has the authority to reduce or eliminate payments to a State on finding that the State's plan no longer complies with § 671(a) or that "there is a substantial failure" in the administration of a plan such that the State is not complying with its own plan. § 671(b). The Act also requires that in order to secure federal reimbursement for foster care payments made with respect to a child involuntarily removed from his home the removal must be "the result of a judicial determination to the effect that continuation [in the child's home] would be contrary to the welfare of such child and (effective October 1, 1983) that reasonable efforts of the type described in section 671(a)(15) of this title have been made." § 672(a)(1). While these statutory provisions may not provide a comprehensive enforcement mechanism so as to manifest Congress' intent to foreclose remedies under § 1983,[11] they do show that the absence of a remedy to pri-

---

[11] We have found an intent by Congress to foreclose remedies under § 1983 where the statute itself provides a comprehensive remedial scheme which leaves no room for additional private remedies under § 1983. *Smith* v. *Robinson*, 468 U. S. 992 (1984); *Middlesex County Sewerage Authority* v. *National Sea Clammers Assn.*, 453 U. S. 1 (1981). We need not consider this question today due to our conclusion that the Adoption Act does not create the federally enforceable right asserted by respondents.

vate plaintiffs under § 1983 does not make the "reasonable efforts" clause a dead letter.[12]

The regulations promulgated by the Secretary to enforce the Adoption Act do not evidence a view that § 671(a) places any requirement for state receipt of federal funds other than the requirement that the State submit a plan to be approved by the Secretary.[13] The regulations provide that to meet the requirements of § 671(a)(15) the case plan for each child must "include a description of the services offered and the services provided to prevent removal of the child from the home and to reunify the family." 45 CFR § 1356.21(d)(4) (1991). Another regulation, entitled "requirements and submittal," provides that a state plan must specify "which preplacement preventive and reunification services are available to children and families in need." § 1357.15(e)(1).[14] What is

---

[12] The language of other sections of the Act also shows that Congress knew how to impose precise requirements on the States aside from the submission of a plan to be approved by the Secretary when it intended to. For example, 42 U. S. C. § 672(e) provides that "[n]o Federal payment may be made under this part" for a child voluntarily placed in foster care for more than 180 days unless within that period there is a judicial determination that the placement is in the best interest of the child. That the "reasonable efforts" clause is not similarly worded buttresses a conclusion that Congress had a different intent with respect to it.

[13] Cf. *Wright* v. *Roanoke Redevelopment and Housing Authority*, 479 U. S. 418, 430–432 (1987) (statute providing that tenants in low-income housing could only be charged 30% of their income as rent, in conjunction with regulations providing that "reasonable utilities" costs were included in the rental figure, created right under § 1983 to not be charged more than a "reasonable" amount for utilities).

[14] The regulation, 45 CFR § 1357.15(e)(2) (1991), goes on to provide a list of which services may be included in the State's proposal:

"Twenty-four hour emergency caretaker, and homemaker services; day care; crisis counseling; individual and family counseling; emergency shelters; procedures and arrangements for access to available emergency financial assistance; arrangements for the provision of temporary child care to provide respite to the family for a brief period, as part of a plan for preventing children's removal from home; other services which the agency identifies as necessary and appropriate such as home-based family serv-

significant is that the regulations are not specific and do not provide notice to the States that failure to do anything other than submit a plan with the requisite features, to be approved by the Secretary, is a further condition on the receipt of funds from the Federal Government. Respondents contend that "[n]either [petitioners] nor amici supporting them present any legislative history to refute the evidence that Congress intended 42 U. S. C. § 671(a)(15) to be enforceable." Brief for Respondents 33. To the extent such history may be relevant, our examination of it leads us to conclude that Congress was concerned that the required reasonable efforts be made by the States, but also indicated that the Act left a great deal of discretion to them.[15]

---

ices, self-help groups, services to unmarried parents, provision of, or arrangements for, mental health, drug and alcohol abuse counseling, vocational counseling or vocational rehabilitation; and post adoption services."

[15] The Report of the Senate Committee on Finance describes how under the system before the Adoption Act States only received reimbursement for payments made with respect to children who were removed from their homes, and how the Act contains a number of provisions in order to "deemphasize the use of foster care," including reimbursing States for developing and administering adoption assistance programs and programs for "tracking" children in foster care, placing a cap on the amount of federal reimbursements a State may receive for foster care maintenance payments, and "specifically permitting expenditures for State . . . services to reunite families." S. Rep. No. 96–336, p. 12 (1979). This Senate Report shows that Congress had confidence in the ability and competency of state courts to discharge their duties under what is now § 672(a) of the Act. *Id.*, at 16 ("The committee is aware of allegations that the judicial determination requirement can become a mere *pro forma* exercise in paper shuffling to obtain Federal funding. While this could occur in some instances, the committee is unwilling to accept as a general proposition that the judiciaries of the States would so lightly treat a responsibility placed upon them by Federal statute for the protection of children").

The House Ways and Means Committee Report on the Adoption Act similarly recognizes that "the entire array of possible preventive services are not appropriate in all situations. The decision as to the appropriate-

Careful examination of the language relied upon by respondents, in the context of the entire Act, leads us to conclude that the "reasonable efforts" language does not unambiguously confer an enforceable right upon the Act's beneficiaries. The term "reasonable efforts" in this context is at least as plausibly read to impose only a rather generalized duty on the State, to be enforced not by private individuals, but by the Secretary in the manner previously discussed.

Having concluded that § 671(a)(15) does not create a federally enforceable right to "reasonable efforts" under § 1983, the conclusion of the Court of Appeals that the Adoption Act contains an implied right of action for private enforcement, 917 F. 2d, at 989, may be disposed of quickly. Under the familiar test of *Cort* v. *Ash*, 422 U. S. 66 (1975), the burden is on respondents to demonstrate that Congress intended to make a private remedy available to enforce the "reasonable

---

ness of specific services in specific situations will have to be made by the administering agency having immediate responsibility for the care of the child." H. R. Rep. No. 96–136, p. 47 (1979).

Remarks on the floor of both the House and the Senate further support these general intentions. See, *e. g.*, 125 Cong. Rec. 22113 (1979) (remarks of Rep. Brodhead) ("What the bill attempts to do is to get the States to enact a series of reforms of their foster care laws, because in the past there has been too much of a tendency to use the foster care program. The reason there has been that tendency is because . . . it becomes a little more expensive for the State to use the protective services than foster care. Through this bill, we want to free up a little bit of money . . . so you will have an incentive to keep a family together"); *id.*, at 29939 (remarks of Sen. Cranston, sponsor of the Adoption Act) ("This requirement in the State plan under [§ 671(a)(15)] would be reinforced by the new requirement under [§ 672] that each State with a plan approved . . . may make foster care maintenance payments only for a child who has been removed from a home as a result of an explicit judicial determination that reasonable efforts to prevent the removal have been made, in addition to the judicial determination required by existing law that continuation in the home would be contrary to the welfare of the child").

efforts" clause of the Adoption Act.[16]   The most important inquiry here as well is whether Congress intended to create the private remedy sought by the plaintiffs.   *Transamerica Mortgage Advisors, Inc.* v. *Lewis,* 444 U. S. 11, 15–16 (1979) ("[W]hat must ultimately be determined is whether Congress intended to create the private remedy asserted").   As discussed above, we think that Congress did not intend to create a private remedy for enforcement of the "reasonable efforts" clause.

We conclude that 42 U. S. C. § 671(a)(15) neither confers an enforceable private right on its beneficiaries nor creates an implied cause of action on their behalf.

The judgment of the Court of Appeals is therefore

*Reversed.*

JUSTICE BLACKMUN, with whom JUSTICE STEVENS joins, dissenting.

The Adoption Assistance and Child Welfare Act of 1980 (Adoption Act or Act) conditions federal funding for state child welfare, foster care, and adoption programs upon, *inter alia,* the State's express commitment to make, "in each case, reasonable efforts" to prevent the need for removing children from their homes and "reasonable efforts," where removal has occurred, to reunify the family.   42 U. S. C. § 671(a)(15).   The Court holds today that the plaintiff chil-

---

[16] As established in *Cort* v. *Ash,* 422 U. S. 66 (1975), these factors are: "First, is the plaintiff one of the class for whose *especial* benefit the statute was enacted, that is, does the statute create a federal right in favor of the plaintiff?   Second, is there any indication of legislative intent, explicit or implicit, either to create such a remedy or to deny one?   Third, is it consistent with the underlying purposes of the legislative scheme to imply such a remedy for the plaintiff?   And finally, is the cause of action one traditionally relegated to state law, in an area basically the concern of the States, so that it would be inappropriate to infer a cause of action based solely on federal law?"   *Id.,* at 78 (internal quotation marks omitted; emphasis in original).

dren in this case may not enforce the State's commitment in federal court either under 42 U. S. C. § 1983 or under the Act itself.

In my view, the Court's conclusion is plainly inconsistent with this Court's decision just two Terms ago in *Wilder* v. *Virginia Hospital Assn.*, 496 U. S. 498 (1990), in which we found enforceable under § 1983 a functionally identical provision of the Medicaid Act requiring "reasonable" reimbursements to health-care providers. More troubling still, the Court reaches its conclusion without even stating, much less applying, the principles our precedents have used to determine whether a statute has created a right enforceable under § 1983. I cannot acquiesce in this unexplained disregard for established law. Accordingly, I dissent.

## I

### A

Section 1983 provides a cause of action for the "deprivation of any rights, privileges, or immunities, secured by the Constitution and laws" of the United States. We recognized in *Maine* v. *Thiboutot*, 448 U. S. 1 (1980), that § 1983 provides a cause of action for violations of federal statutes, not just the Constitution. Since *Thiboutot*, we have recognized two general exceptions to this rule. First, no cause of action will lie where the statute in question does not "'create enforceable rights, privileges, or immunities within the meaning of § 1983.'" *Wilder*, 496 U. S., at 508 (quoting *Wright* v. *Roanoke Redevelopment and Housing Authority*, 479 U. S. 418, 423 (1987)). Second, § 1983 is unavailable where "Congress has foreclosed such enforcement of the statute in the enactment itself." 496 U. S., at 508.

In determining the scope of the first exception—whether a federal statute creates an "enforceable right"—the Court has developed and repeatedly applied a three-part test. We have asked (1) whether the statutory provision at issue "'was intend[ed] to benefit the putative plaintiff.'" *Id.*, at

509 (quoting *Golden State Transit Corp.* v. *Los Angeles*, 493 U. S. 103, 106 (1989)). If so, then the provision creates an enforceable right unless (2) the provision "reflects merely a 'congressional preference' for a certain kind of conduct rather than a binding obligation on the governmental unit," 496 U. S., at 509 (quoting *Pennhurst State School and Hospital* v. *Halderman*, 451 U. S. 1, 19 (1981)), or unless (3) the plaintiff's interest is so "'vague and amorphous'" as to be "'beyond the competence of the judiciary to enforce.'" 496 U. S., at 509 (quoting *Golden State*, 493 U. S., at 106, in turn quoting *Wright*, 479 U. S., at 431–432). See also *Dennis* v. *Higgins*, 498 U. S. 439, 448–449 (1991) (quoting and applying the three-part test as stated in *Golden State*). The Court today has little difficulty concluding that the plaintiff children in this case have no enforceable rights, because it does not mention—much less apply—this firmly established analytic framework.

B

In *Wilder*, we held that under the above three-part test, the Boren Amendment to the Medicaid Act creates an enforceable right. As does the Adoption Act, the Medicaid Act provides federal funding for state programs that meet certain federal standards and requires participating States to file a plan with the Secretary of Health and Human Services. Most relevant here, the Medicaid Act, like the Adoption Act, requires that the State undertake a "reasonableness" commitment in its plan. With respect to the rate at which providers are to be reimbursed, the Boren Amendment requires:

> "A State plan for medical assistance must—
>
> .       .       .       .       .
>
> "provide . . . for payment . . . [of services] provided under the plan through the use of rates (determined in accordance with methods and standards developed by the State . . .) which the State finds, and makes assurances satisfactory to the Secretary, are *reasonable and*

*adequate* to meet the costs which must be incurred by efficiently and economically operated facilities in order to provide care and services in conformity with applicable State and Federal laws, regulations, and quality and safety standards and to assure that individuals eligible for medical assistance have *reasonable* access . . . to inpatient hospital services of *adequate* quality." 42 U. S. C. § 1396a(a)(13)(A) (emphasis supplied).

In *Wilder*, we had no difficulty concluding that the reimbursement provision of the Boren Amendment "was intend[ed] to benefit" the plaintiff providers of Medicaid services. 496 U. S., at 509. We also concluded that the second part of the test was satisfied. The amendment, we held, does not simply express a "congressional preference" for reasonable and adequate reimbursement rates; rather, it imposes a "binding obligation" on the State to establish and maintain such rates. *Id.*, at 512. In so concluding, we emphasized two features of the Medicaid reimbursement scheme. First, we observed that the language of the provision is "cast in mandatory rather than precatory terms," stating that the plan *"must"* provide for reasonable and adequate reimbursement. *Ibid.* Second, we noted that the text of the statute expressly conditions federal funding on state compliance with the amendment and requires the Secretary to withhold funds from noncomplying States. *Ibid.* In light of these features of the Medicaid Act, we rejected the argument, advanced by the defendant state officials and by the United States as *amicus curiae,* that the only enforceable state obligation is the obligation to file a plan with the Secretary, to find that its rates are reasonable and adequate, and to make assurances to that effect in the plan. *Id.,* at 512–515. Rather, we concluded, participating States are required actually to provide reasonable and adequate rates, not just profess to the Secretary that they have done so. *Ibid.*

Finally, we rejected the State's argument that Medicaid providers' right to "reasonable and adequate" reimburse-

ment is "too vague and amorphous" for judicial enforcement. We acknowledged that the State has "substantial discretion" in choosing among various methods of calculating reimbursement rates. *Id.*, at 519; see also *id.*, at 505–508. A State's discretion in determining how to calculate what rates are "reasonable and adequate," we concluded, "may affect the standard under which a court reviews" the State's reimbursement plan, but it does not make the right to reasonable reimbursement judicially unenforceable. *Id.*, at 519.

## C

These principles, as we applied them in *Wilder*, require the conclusion that the Adoption Act's "reasonable efforts" clause[1] establishes a right enforceable under § 1983. Each of the three elements of our three-part test is satisfied. First, and most obvious, the plaintiff children in this case are clearly the intended beneficiaries of the requirement that the State make "reasonable efforts" to prevent unnecessary removal and to reunify temporarily removed children with their families.

Second, the "reasonable efforts" clause imposes a binding obligation on the State because it is "cast in mandatory rather than precatory terms," providing that a participating State "*shall* have a plan approved by the Secretary which . . . *shall be in effect* in all political subdivisions of the State, and, if administered by them, be *mandatory* upon them." Further, the statute requires the plan to "provid[e] that, in each case, reasonable efforts *will be made*." Moreover, as

---

[1] "In order for a State to be eligible for payments under this part, it shall have a plan approved by the Secretary which—. . . (3) provides that the plan shall be in effect in all political subdivisions of the State, and, if administered by them, be mandatory upon them; [and] . . . (15) . . . provides that, in each case, reasonable efforts will be made (A) prior to the placement of a child in foster care, to prevent or eliminate the need for removal of the child from his home, and (B) to make it possible for the child to return to his home." 42 U. S. C. § 671(a).

in *Wilder*, the statutory text expressly conditions federal funding on state compliance with the plan requirement and requires the Secretary to reduce payments to a State if "in the administration of [the State's] plan there is a substantial failure to comply with the provisions of the plan." 42 U. S. C. § 671(b). Under our holding in *Wilder*, these provisions of the Adoption Act impose a binding obligation on the State. Indeed, neither the petitioner state officials nor *amicus* United States dispute this point. Brief for Petitioners 17; Reply Brief for Petitioners 3, n. 2; Brief for United States as *Amicus Curiae* 13–14.

What petitioners and *amicus* United States do dispute is whether the third element of the *Golden State-Wilder-Dennis* test has been satisfied: They argue that the "reasonable efforts" clause of the Adoption Act is too "vague and amorphous" to be judicially enforced. Aware that *Wilder* enforced an apparently similar "reasonableness" clause, they argue that *this* clause is categorically different.

According to petitioners, the Court would not have found the Boren Amendment's reasonableness clause enforceable had the statute not provided an "objective benchmark" against which "reasonable and adequate" reimbursement rates could be measured. Reasonable and adequate rates, the Boren Amendment provides, are those that meet the costs that would be incurred by "an 'efficiently and economically operated facilit[y]' providing care in compliance with federal and state standards while at the same time ensuring 'reasonable access' to eligible participants." *Wilder*, 496 U. S., at 519 (quoting 42 U. S. C. § 1396a(a)(13)(A)). Petitioners claim that, given this benchmark, "reasonable and adequate" rates can be ascertained by "*monetary* calculations easily determined based on prevailing rates in the market." Brief for Petitioners 21. By contrast, they observe, there is "no market for 'reasonable efforts' to keep or return a child home, and such 'reasonable efforts' cannot be calculated or quantified." *Ibid.*

Petitioners misunderstand the sense in which the "benchmark" in *Wilder* is "objective." The Boren Amendment does not simply define "reasonable and adequate" rates as market rates. Rather, it defines a "reasonable and adequate" rate by referring to what *would* be provided by a *hypothetical* facility—one that operates "efficiently and economically," "compli[es] with federal and state standards," and "ensur[es] 'reasonable access' to eligible participants." Whether particular existing facilities meet those criteria is not a purely empirical judgment that requires only simple "monetary calculations." Indeed, the Boren Amendment's specification of the words "reasonable and adequate" ultimately refers us to a *second* reasonableness clause: The "benchmark" facility, we are told, is one that "ensure[s] '*reasonable access*' to eligible participants." This second reasonableness clause is left undefined. Contrary to petitioners' suggestions, then, the "reasonable and adequate" rates provision of the Boren Amendment is not "objective" in the sense of being mechanically measurable. The fact that this Court found the provision judicially enforceable demonstrates that an asserted right is not "vague and amorphous" simply because it cannot be easily "calculated or quantified."

Petitioners also argue that the right to "reasonable efforts" is "vague and amorphous" because of substantial disagreement in the child-welfare community concerning appropriate strategies. Furthermore, they contend, because the choice of a particular strategy in a particular case necessarily will depend upon the facts of that case, a court-enforced right to reasonable efforts either will homogenize very different situations or else will fragment into a plurality of "rights" that vary from State to State. For both of these reasons, petitioners contend, Congress left the question of what efforts are "reasonable" to state juvenile courts, the recognized experts in such matters.

Here again, comparison with *Wilder* is instructive. The Court noted the lack of consensus concerning which of vari-

ous possible methods of calculating reimbursable costs would best promote efficient operation of health-care facilities. See *Wilder*, 496 U. S., at 506–507. The Court further noted that Congress chose a standard that leaves the States considerable autonomy in selecting the methods they will use to determine which reimbursement rates are "reasonable and adequate." *Id.*, at 506–508, 515. The result, of course, is that the "content" of the federal right to reasonable and adequate rates—the method of calculating reimbursement and the chosen rate—varies from State to State. And although federal judges are hardly expert either in selecting methods of Medicaid cost reimbursement or in determining whether particular rates are "reasonable and adequate," neither the majority nor the dissent found that the right to reasonable and adequate reimbursement was so vague and amorphous as to be "beyond the competence of the judiciary to enforce." See *id.*, at 519–520; *id.*, at 524 (REHNQUIST, C. J., dissenting). State flexibility in determining what is "reasonable," we held,

> "may affect the standard under which a court reviews whether the rates comply with the amendment, but it does not render the amendment unenforceable by a court. While there may be a range of reasonable rates, there certainly are *some* rates outside that range that no State could ever find to be reasonable and adequate under the Act." *Id.*, at 519–520.

The same principles apply here. There may be a "range" of "efforts" to prevent unnecessary removals or secure beneficial reunifications that are "reasonable." *Ibid.* It may also be that a court, in reviewing a State's strategies of compliance with the "reasonable efforts" clause, would owe substantial deference to the State's choice of strategies. That does not mean, however, that *no* State's efforts could *ever* be deemed "unreasonable." As in *Wilder*, the asserted right in

this case is simply not inherently "beyond the competence of the judiciary to enforce." *Ibid.*

Petitioners' argument that the "reasonable efforts" clause of the Adoption Act is so vague and amorphous as to be unenforceable assumes that in *Wright* and *Wilder* the Court was working at the outer limits of what is judicially cognizable: Any deviation from *Wright* or *Wilder*, petitioners imply, would go beyond the bounds of judicial competence. There is absolutely nothing to indicate that this is so. See *Wilder*, 496 U. S., at 520 (inquiry into reasonableness of reimbursement rates is *"well within* the competence of the Judiciary") (emphasis supplied). Federal courts, in innumerable cases, have routinely enforced reasonableness clauses in federal statutes. See, *e. g., Virginian R. Co.* v. *Railway Employees*, 300 U. S. 515, 518, 550 (1937) (enforcing "every reasonable effort" provision of the Railway Labor Act and noting that "whether action taken or omitted is . . . reasonable [is an] everyday subjec[t] of inquiry by courts in framing and enforcing their decrees"). Petitioners have not shown that the Adoption Act's reasonableness clause is exceptional in this respect.

## II

The Court does not explain why the settled three-part test for determining the enforceability of an asserted right is not applied in this case. Moreover, the reasons the Court does offer to support its conclusion—that the Adoption Act's "reasonable efforts" clause creates no enforceable right—were raised and rejected in *Wilder*.

The Court acknowledges that the Adoption Act is "mandatory in its terms." *Ante,* at 358. It adopts, however, a narrow understanding of what is "mandatory." It reasons that the language of § 671(a), which provides that "[i]n order for a State to be eligible for payments under this part, it shall have a plan approved by the Secretary," requires participating States only to submit and receive approval for a plan that contains the features listed in §§ 671(a)(1) to (16). According

to the Court, the beneficiaries of the Act enjoy at most a procedural right under § 671(a)—the right to require a participating State to prepare and file a plan—not a substantive right to require the State to live up to the commitments stated in that plan, such as the commitment to make "reasonable efforts" to prevent unnecessary removals and secure beneficial reunifications of families. Since the State of Illinois has filed a plan that the Secretary has approved, the Court reasons, the State has violated no right enforceable in federal court.

The Court's reasoning should sound familiar: The state officials in *Wilder* made exactly the same argument, and this Court rejected it. In *Wilder*, we noted that the Medicaid Act expressly conditions federal funding on state compliance with the provisions of an approved plan, and that the Secretary is required to withhold payments from noncomplying States. See 496 U. S., at 512 (citing 42 U. S. C. § 1396c).[2] In substantially identical language, the Adoption Act, too, requires States to live up to the commitments stated in their plans.[3] To be sure, the Court's reasoning is consistent with the *dissent* in *Wilder*. See 496 U. S., at 524, 527–528 (REHNQUIST, C. J., dissenting). But it flatly contradicts what the Court *held* in that case.

The Court attempts to fend off this conclusion in two ways, neither of them persuasive. First, the Court seeks to distinguish *Wilder*, asserting that our conclusion—that the Boren Amendment gave the health-care providers a substantive right to reasonable and adequate reimbursement—"relied in

---

[2] "If the Secretary . . . finds . . . that in the administration of the plan there is a failure to comply substantially with any . . . provision [required to be included in the plan,] the Secretary shall notify [the] State agency that further payments will not be made . . . ." 42 U. S. C. § 1396c.

[3] "[I]n any case in which the Secretary finds . . . there is a substantial failure to comply with the provisions of [an approved] plan, the Secretary shall notify the State that further payments will not be made . . . , or that such payments will be made to the State but reduced by an amount which the Secretary determines appropriate . . . ." 42 U. S. C. § 671(b).

part on the fact that the statute and regulations set forth in some detail the factors to be considered in determining the methods for calculating rates." *Ante,* at 359 (citing *Wilder,* 496 U. S., at 519, n. 17). By contrast, the Court continues, neither the provisions of the Adoption Act nor the implementing regulations offer any guidance as to how the term "reasonable efforts" should be interpreted.

Even assuming that it is accurate to call the statute and regulations involved in that case "detailed,"[4] the Court has misread *Wilder.* The Court there referred to the relative specificity of the statute and regulations not to demonstrate that the health-care providers enjoyed a substantive right to reasonable and adequate rates—we had already concluded that the State was under a binding obligation to adopt such rates, see *Wilder,* 496 U. S., at 514–515—but only to reinforce our conclusion that the providers' interest was not so "vague and amorphous" as to be "beyond the competence of judicial enforcement." See 496 U. S., at 519, n. 17. Under our three-part test, the Court would not have inquired whether that interest was "vague and amorphous" unless it had *already* concluded that the State was required to do more than simply file a paper plan that lists the appropriate factors.

---

[4] Petitioners suggest a sharp contrast between the implementing regulations considered in *Wilder* and the implementing regulation for the Adoption Act "reasonable efforts" provision: The former, they say, require the State to consider certain factors, but the latter merely provides "a laundry list of services the States *'may'* provide." Brief for Petitioners 34 (citing 45 CFR § 1357.15(e) (1991)). Further, petitioners emphasize the Department of Health and Human Services' remark during rulemaking that States must retain flexibility in administering the Adoption Act's "reasonable efforts" requirement. Brief for Petitioners 34–35.

Neither of these factors marks a significant difference between *Wilder* and the present case. The difference between *requiring* States to *consider* certain factors, as in *Wilder,* and *permitting* States to *provide* certain listed services, as in the present case, is hardly dramatic. As for the second asserted difference, *Wilder* itself emphasized that States must retain substantial discretion in calculating "reasonable and adequate" reimbursement rates.

Second, the Court emphasizes: "Other sections of the [Adoption] Act provide enforcement mechanisms for the reasonable efforts clause of 42 U. S. C. § 671(a)(15)." *Ante,* at 360. Such "mechanisms" include the Secretary's power to cut off or reduce funds for noncompliance with the state plan, and the requirement of a state judicial finding that "reasonable efforts" have been made before federal funds may be used to reimburse foster care payments for a child involuntarily removed.

The Court has apparently forgotten that ever since *Rosado* v. *Wyman,* 397 U. S. 397 (1970), the power of the Secretary to enforce congressional spending conditions by cutting off funds has not prevented the federal courts from enforcing those same conditions. See *id.,* at 420, 422–423. Indeed, we reasoned in *Wilder* that a similar "cutoff" provision *supports* the conclusion that the Medicaid Act creates an enforceable right, because it puts the State "on notice" that it may not simply adopt the reimbursement rates of its choosing. See 496 U. S., at 514. As for the Court's contention that § 671(a)(15) should be enforced through individual removal determinations in state juvenile court, the availability of a state judicial forum can hardly deprive a § 1983 plaintiff of a federal forum. *Monroe* v. *Pape,* 365 U. S. 167, 183 (1961). The Court's reliance on enforcement mechanisms other than § 1983, therefore, does not support its conclusion that the "reasonable efforts" clause of the Adoption Act creates no enforceable right.

The Court, without acknowledgment, has departed from our precedents in yet another way. In our prior cases, the existence of other enforcement mechanisms has been relevant not to the question whether the statute at issue creates an enforceable right, but to whether the second exception to § 1983 enforcement applies—whether, that is, "'Congress has foreclosed such enforcement of the statute in the enactment itself.'" *Wilder,* 496 U. S., at 508 (quoting *Wright* v. *Roanoke Redevelopment and Housing Authority,* 479 U. S., at

423). In determining whether this second exception to § 1983 enforcement applies, we have required the defendant not merely to point to the existence of alternative means of enforcement, but to demonstrate "by express provision or other specific evidence from the statute itself that Congress intended to foreclose [§ 1983] enforcement." 496 U. S., at 520–521. We have said repeatedly that we will not "lightly" conclude that Congress has so intended. *Id.*, at 520 (quoting *Wright*, 479 U. S., at 423–424, in turn quoting *Smith* v. *Robinson*, 468 U. S. 992, 1012 (1984)). In only two instances, where we concluded that "the statute itself provides a comprehensive remedial scheme which leaves no room for additional private remedies under § 1983," *ante*, at 360, n. 11, have we held that Congress has intended to foreclose § 1983 enforcement. See *Smith* v. *Robinson*, 468 U. S. 992 (1984) ("carefully tailored" mixed system of enforcement beginning with local administrative review and culminating in a right to judicial review); *Middlesex County Sewerage Authority* v. *National Sea Clammers Assn.*, 453 U. S. 1 (1981) (enforcement scheme authorizing Environmental Protection Agency to bring civil suits, providing for criminal penalties, and including two citizen-suit provisions).

The Court does not find these demanding criteria satisfied here. See *ante*, at 360–361, and n. 11. Instead, it simply circumvents them altogether: The Court holds that even if the funding cutoff provision in the Adoption Act is not an "express provision" that "provides a comprehensive remedial scheme" leaving "no room for additional private remedies under § 1983," *Wilder*, 496 U. S., at 520, that provision nevertheless precludes § 1983 enforcement. In so holding, the Court has inverted the established presumption that a private remedy is available under § 1983 unless "Congress has affirmatively withdrawn the remedy." 496 U. S., at 509, n. 9 (citing *Golden State Transit Corp.* v. *Los Angeles*, 493 U. S., at 106–107, and *Wright*, 479 U. S., at 423–424).

## III

In sum, the Court has failed, without explanation, to apply the framework our precedents have consistently deemed applicable; it has sought to support its conclusion by resurrecting arguments decisively rejected less than two years ago in *Wilder;* and it has contravened 22 years of precedent by suggesting that the existence of other "enforcement mechanisms" precludes § 1983 enforcement. At least for this case, it has changed the rules of the game without offering even minimal justification, and it has failed even to acknowledge that it is doing anything more extraordinary than "interpret-[ing]" the Adoption Act "by its own terms." *Ante,* at 358, n. 8. Readers of the Court's opinion will not be misled by this hollow assurance. And, after all, we are dealing here with children. I would affirm the judgment of the Court of Appeals.[5] I dissent.

---

[5] Since I conclude that respondents have a cause of action under § 1983, I need not reach the question, decided in the affirmative by the Court of Appeals, whether petitioners may pursue a private action arising directly under the Adoption Act.