**Francis A. MUNGIOVI, Plaintiff–Appellant,**

v.

**CHICAGO HOUSING AUTHORITY, Essie Smith, and William Bradley, Defendants–Appellees.**

No. 95–3421.

United States Court of Appeals, Seventh Circuit.

Submitted Oct. 8, 1996.

Decided Oct. 23, 1996.

Rehearing Denied Nov. 19, 1996.

Francis A. Mungiovi (submitted), Chicago, IL, for Plaintiff–Appellant.

Delcine Mary Thompson, David K. Hill, Jordan E. Marsh, Chicago Housing Authority, Office of the General Counsel, Chicago, IL, for Chicago Housing Authority.

Delcine Mary Thompson, Chicago Housing Authority, Office of the General Counsel, Chicago, IL, for Essie Smith, William Bradley.

Before COFFEY, EASTERBROOK and KANNE, Circuit Judges.

EASTERBROOK, Circuit Judge.

Francis A. Mungiovi, who lives in the Shields Apartments—public housing operated by the Chicago Housing Authority—contends that the CHA has refused to deal with him in his capacity as "building president," a post to which, he says, other tenants have elected him. The CHA does not recognize the existence of such a position. Under federal regulations a public housing authority must negotiate with a "resident council" on some issues. 24 C.F.R. § 964.18(a)(1), (6). See generally 24 C.F.R. Part 964. But Mungiovi is not a "resident council," a representative body that must have a governing board of five or more members. 24 C.F.R. § 964.115(c). Mungiovi filed this suit under 42 U.S.C. § 1983 and asked the district court to direct the CHA to negotiate with him, personally. (He also asked the district court to recruit a lawyer to help him press this argument; the court's refusal to do so was not an abuse of discretion. See *Farmer v. Haas*, 990 F.2d 319, 323 (7th Cir.1993).)

Mungiovi does not rely on any federal statute, he isn't a resident council, and he can't use the Administrative Procedure Act to enforce against a state agency federal regulations that in general terms favor ten-

ant participation in management. He therefore argues that § 1983 permits a federal court to create and enforce a duty related to, but not specified in, the regulations. See *Maine v. Thiboutot*, 448 U.S. 1, 100 S.Ct. 2502, 65 L.Ed.2d 555 (1980). The district court disagreed and dismissed the complaint under Fed.R.Civ.P. 12(b)(6) for failure to state a claim on which relief may be granted. 914 F.Supp. 207 (N.D.Ill.1995). The court gave two reasons: first, that the rules in Part 964 are too vague to support a claim under § 1983, see *Suter v. Artist M.*, 503 U.S. 347, 112 S.Ct. 1360, 118 L.Ed.2d 1 (1992); second, that enforcement lies with the Secretary of Housing and Urban Development rather than with the courts. We have some doubt about the first of these, but the second is unassailable.

■ One problem with Mungiovi's position is that § 1983 provides a federal remedy only for "the deprivation of any rights, privileges, or immunities secured by the Constitution and laws" of the United States. The reference to "laws" cannot readily be understood to imply a reference to regulations of all kinds—for the introductory clause ("Every person who, under color of any statute, ordinance, regulation, custom, or usage ...") shows that Congress distinguished statutes from regulations. None of the Supreme Court's cases beginning with *Thiboutot* uses § 1983 to enforce a federal regulation that creates a right independent of any federal statute. And for purposes of other statutes with structures similar to that of § 1983 we have held that regulations are *not* laws. Consider 28 U.S.C. § 2255, which authorizes a court to provide relief when a conviction or sentence violates the Constitution, treaties, or laws of the United States. Does a violation of the Sentencing Guidelines authorize relief under § 2255? We held not in *Scott v. United States*, 997 F.2d 340 (7th Cir.1993), in part because, although the Guidelines have the "force of law," they are not statutes. By analogy, a plaintiff cannot use § 1983 to enforce regulations in the abstract; enforcement depends on the role regulations play in making statutory obligations more concrete, as in *Wright v. Roanoke Redevelopment & Housing Authority*, 479 U.S. 418, 107 S.Ct. 766, 93 L.Ed.2d 781 (1987). This leads us to inquire what law Part 964 implements, a question neither the parties nor the district court asked.

The statute behind the idea of "resident councils" is § 20 of the Housing Act of 1937, 42 U.S.C. § 1437r. See 53 Fed.Reg. 34676 (Aug. 30, 1988) (initial promulgation of Part 964 to implement § 20); 59 Fed.Reg. 43622 (Aug. 18, 1994) (thorough revision). Section 20, extensively revamped in 1987, offers public housing authorities incentives to permit residents to manage the buildings. Election of a resident council under § 20(b)(1), § 1437r(b)(1), is the first step toward formation of a "resident management corporation" that will hire a "public housing management specialist" and take over day-to-day operation of the building. If § 20 were compulsory—that is, if it gave tenants a *right* to take over management—it would be definite enough to be enforced under § 1983. It would be no less clear than the National Labor Relations Act, which requires negotiation but not agreement, and which has been enforced against cities by litigation under § 1983. *Golden State Transit Corp. v. Los Angeles*, 493 U.S. 103, 110 S.Ct. 444, 107 L.Ed.2d 420 (1989). See also *Methodist Hospitals, Inc. v. Sullivan*, 91 F.3d 1026 (7th Cir.1996) (a statutory reference to "geographic area" does not prevent enforcement under § 1983, because that phrase is no more vague than "geographic market" in antitrust law). Mungiovi does not contend that he wants to manage the Shields Apartments through a resident management corporation. More to the point, § 20 does not require the Chicago Housing Authority to assent to any such takeover. A housing authority that manages the buildings itself loses the extra revenues that may be available if a resident management corporation is run efficiently. But § 20 and Part 964 do not oblige the public agency to turn management over to tenants. There is no legal obligation to enforce, through § 1983 or any other device.

Two sections of Part 964 call on housing authorities to treat with resident councils about subjects other than the establishment of resident management corporations. See §§ 964.18(a), 964.135. For example, § 964.135(b) provides: "Residents shall be

actively involved in a [housing authority's] decision-making process and give advice on matters such as modernization, security, maintenance, resident screening and selection, and recreation." Section 20 of the Housing Act does not establish this obligation. It appears instead to be a condition attached to a grant of money from the Department of Housing and Urban Development. See 24 C.F.R. § 964.150, and 24 C.F.R. Part 990. An introductory provision to all of Part 964 states that it applies only to a housing authority "that has a Public Housing Annual Contributions Contract (ACC) with HUD." 24 C.F.R. § 964.3(a).

Mungiovi does not contend that HUD and the CHA have signed such a contract. Suppose they have. Then the obligation must be enforced in the way specified by contract—or by the standard contractual terms that appear in Part 964. According to § 964.18(a)(6), enforcement is administrative: "If a [housing authority] fails to negotiate with a resident council in good faith or, after negotiations, refuses to permit such usage of community space [as the regulation requires], the resident council may file an informal appeal with HUD, setting out the circumstances and providing copies of relevant materials evidencing the resident council's efforts to negotiate a written agreement." The administrative process elaborated in this section does not even lead to a concrete sanction if HUD concludes that the housing authority should have accepted the resident council's proposal. Instead HUD will declare an impasse. In labor law, this could be followed by a strike or lockout, not by litigation; in housing law, a shortcoming by a housing authority is followed by a reduction of funding—or, as has happened already at the CHA, the appointment of a receiver who will manage the local agency until things can be straightened out. Section 6 of the Housing Act, 42 U.S.C. § 1437d, specifies these and other consequences when a housing agency does not keep its contracts with HUD. Lawsuits by individual tenants are not among the prescribed consequences.

■ Section 1983 cannot be used to bypass these remedies, or to replace an administrative enforcement scheme with a judicial one.

*Suter,* 503 U.S. at 360–61, 112 S.Ct. at 1368–69. A resident council disappointed by a housing authority's intransigence must complain to HUD, which may respond by reducing the housing authority's federal grant. Perhaps HUD would conclude that the entire structure of § 20 and Part 964 is aspirational rather than right-creating. See *Pennhurst State School & Hospital v. Halderman,* 451 U.S. 1, 101 S.Ct. 1531, 67 L.Ed.2d 694 (1981). Granted, an administrative remedy does not preclude enforcement under § 1983 of a statute conferring a right directly on tenants of public housing; so *Wright* holds for the maximum-rent rules in 42 U.S.C. § 1437a. As we have explained, however, § 20 of the Housing Act does not confer rights on tenants; it just gives housing authorities a financial reason to let tenants play a role in management. The extra requirements imposed by HUD in Part 964—requirements without any statutory basis comparable to § 1437a—must be enforced by HUD, if they are to be enforced at all.

AFFIRMED.