## Parker v. Philadelphia Housing Authority

*Peter R. Kohn,* for plaintiffs.
*Leigh Bechtle* and *Janice L. Kolber,* for defendant.

DiNUBILE, *J.,* February 10, 1997—Defendant Philadelphia Housing Authority has filed a post-trial motion seeking judgment n.o.v. following the jury trial and verdict in favor of two minor plaintiffs in this lead paint poisoning action. This opinion arises from the trial court's denial of these motions and the entry of judgment on the jury verdict in favor of minor-plaintiff Ibn Tyrone Leanier, age 14, in the amount of $105,000, and minor-plaintiff Melika Parker, age 16, in the amount of $62,000. Suit was brought on behalf of Tyrone and Melika by their mother, Tanya Parker. The total verdict was $167,000. An award of delay damages was assessed in the amount of $12,525 for both cases.

At trial, plaintiffs pursued two theories of liability against PHA: negligence, as well as violation of the Civil Rights Act, 42 U.S.C. §1983, based on PHA's alleged failure to comply with the Federal Lead-Based Paint Poisoning Prevention Act, 42 U.S.C. §4801 et seq., the United States Housing Act of 1937, 42 U.S.C. §1437 et seq., and the regulations promulgated under authority of these two laws. The jury was presented with evidence supporting both theories at trial, and returned verdicts in favor of plaintiffs on both causes of action.

PHA does not challenge the jury's finding of negligence or the verdict of $167,000, nor does PHA challenge the award of delay damages assessed on the verdict since the verdict was awarded concomitantly on both the negligence and civil rights theories so that judgment n.o.v. on the latter theory would not vitiate the verdict.[1]

1. Neither did the parties challenge the trial court's jury instruction that PHA, a governmental agency actor, could be held liable under

The issue presented by this post-trial motion pertains solely to the validity of the jury's conclusion that PHA was liable under section 1983 of the Civil Rights Act. PHA asserts that even if it did violate the statutes and regulations at issue, plaintiffs had no private cause of action to enforce these statutes and regulations under section 1983. After analyzing the statutory schemes at issue and the pertinent case law, this court respectfully disagrees. Accordingly, PHA's post-trial motion is denied.[2]

The Parker family, consisting of Melika, Tyrone, and their mother, Tanya Parker, moved into an apartment unit in the PHA-owned Norris "high rise" complex at 2037 North 11th Street, in North Philadelphia, in November of 1983. A third child, Kevin Parker, was born to Ms. Parker in November of 1985 while the family was living in the Norris development.[3] The family lived there until December of 1986. Evidence was presented that there was chipping and peeling paint throughout plaintiffs' apartment, and that PHA had known since 1975 that the apartment contained lead-based paint but failed to remove it or take precautionary measures to protect minor plaintiffs from exposure to lead paint there in violation of federal statutes and regulations. Evidence was presented that Melika and Tyrone suffered substantial lead paint poisoning resulting in lowered I.Q.s, learning disabilities, and behavioral problems

---

section 1983 only if its actions arose to the level of "deliberate indifference to public safety." *Fagan v. City of Vineland,* 22 F.3d 1283 (3rd Cir. 1994).

2. Accordingly, as the prevailing party on their section 1983 claim, plaintiffs may be entitled to an award of attorneys' fees under 42 U.S.C. §1988. A hearing on this matter will be scheduled.

3. Kevin, age 10, was also a party to this suit; the evidence demonstrated the lead paint hazard at issue was removed by the time of Kevin's birth, however, and the jury returned a verdict in favor of PHA on Kevin's claim. Plaintiffs did not challenge this verdict.

caused by PHA's violations of these statutes and regulations. This evidence was evidently accepted by the jury, which found PHA liable under both plaintiffs' negligence and civil rights theories despite PHA's vigorous defense.

The issue presented by PHA's post-trial motion may be stated as follows: whether plaintiffs may enforce the lead paint provisions in the USHA, the LBPPPA, and the regulations promulgated thereunder, by means of a private action for money damages under section 1983. This section of the Civil Rights Act provides a cause of action for deprivations by state actors of rights, privileges and immunities secured by the Constitution and the laws of the United States. *Wilder v. Virginia Hospital Assoc.,* 496 U.S. 498, 110 S.Ct. 2510 (1990). *Maine v. Thiboutot,* 448 U.S. 1, 100 S.Ct. 2502 (1980), first established that section 1983 was available as a remedy for violation of federal statutes as well as constitutional violations. Subsequent to this ruling, the Supreme Court has developed two exceptions to the rule permitting private recovery under section 1983. If Congress specifically forecloses enforcement of a statute under section 1983 in the body of the statute itself, then no private action will stand. *Middlesex County Sewerage Authority v. National Sea Clammers Association,* 453 U.S. 1, 101 S.Ct. 2615 (1981). The second exception arises where a federal statute does not "create enforceable rights, privileges or immunities within the meaning of section 1983." *Wilder, supra,* 496 U.S. at 508, 110 S.Ct. at 2516. The determination whether such enforceable rights, privileges or immunities exist in a particular statute within the meaning of section 1983 involves a careful analysis of the statutory scheme in question. To this end, a three-pronged test has been developed: (1) Are the provisions of the statute intended to benefit the putative plaintiff? (2) Do the provisions of the statute impose some binding

or mandatory obligation on the state entity, or are they merely precatory in nature? (3) Is the interest of the party seeking redress under section 1983 so vague and amorphous as to be beyond the competence of the judiciary to enforce? *Wilder, supra; Wright v. City of Roanoke Redevelopment & Housing Authority,* 479 U.S. 418, 107 S.Ct. 766 (1987); see also, dissenting opinion in *Suter v. Artist M.,* 503 U.S. 347, 112 S.Ct. 1360 (1992).

Neither the USHA nor LBPPPA specifically foreclose a private right of action under section 1983 so it must be determined whether the statutes and their regulations can be said to create enforceable rights, privileges or immunities within the meaning of section 1983. Applying the three-pronged test to the statutory scheme in question, it is clear that plaintiffs have a private cause of action to enforce these statutes under section 1983.

The case of *Hunter v. Norfolk Redevelopment & Housing Authority,* memorandum and order, E.D. Va. 1995, civil action no. 2:95CV878, is directly on point. It held that a private cause of action under section 1983 existed for minor plaintiffs injured by a public housing authority's violation of certain provisions of the USHA and the LBPPPA and their regulations. In arriving at this conclusion, the *Hunter* court reviewed the statutory scheme at issue: Under USHA, public housing agencies function as the local implementing arms of the federal housing assistance program administered by HUD, and these housing agencies, as recipients of federal funds, are obligated to make the housing they administer and own suitable for living. The LBPPPA requires HUD to establish procedures to eliminate lead-based paint hazards with respect to existing public housing. Housing quality standards which set forth requirements for inspecting, testing, and ameliorating lead paint hazards in public housing are specified in HUD regulations. See *e.g.,* 24 C.F.R. §882.109(i).

The *Hunter* court used the three-pronged test to analyze the provisions of the USHA and the LBPPPA on which plaintiffs relied. For the first prong, the court found the statutory scheme was intended to benefit the putative plaintiff:

"It is clear that plaintiffs in this case are the intended beneficiaries of the lead paint provisions of USHA and LBPPPA. LBPPPA states that the regulations created under the law are intended to 'eliminate' as far as practicable the hazards of lead-based paint poisoning with respect to any existing housing which may present such hazards and which is covered by a HUD program." Memorandum and order at 7.

As for the second prong, whether the provisions of the Act reflected merely a congressional preference for a certain kind of conduct rather than a binding obligation on a governmental unit, the *Hunter* court had no difficulty concluding the provisions at issue were mandatory:

"The (LBPPPA) clearly places obligations and not options on HUD. . . . The regulations promulgated under LBPPPA in turn place mandatory obligations on local housing authorities. These regulations speak of 'requirements' of the housing authorities that 'shall' be performed in the course of determining compliance with housing quality standards. . . . The statutes and regulations must be considered mandatory in nature. . . . The statutes and regulations under LBPPPA create a body of mandatory directives to the secretary or to the public housing authorities." Memorandum and order at 8-9. (citations omitted)

As for the third prong, whether plaintiffs' interest in this case was so vague and amorphous as to be beyond the competence of the judiciary to enforce, the *Hunter* court found the statutory scheme was clear and specific:

"The statutes and regulations are also specific in their requirements, again evidencing the creation of a 'federal right.' Indeed, LBPPPA and the implementing regulations set up a comprehensive system of lead paint poisoning prevention. This system, implemented through the housing authorities, consists of notification . . ., initial inspections of housing units . . ., and annual inspection of housing units. . . . The regulations dictate what the inspectors are searching for—defective paint surfaces as defined in the statute. . . . Upon finding defective paint surfaces, the regulations command notice to the owner and treatment of the defective condition in accordance with the regulations." Memorandum and order at 9-10. (citations omitted)

This court adopts the holding and analysis of *Hunter.* The USHA and the LBPPPA provisions so thoroughly scrutinized by the *Hunter* court are substantively identical to those which plaintiffs at bar seek to enforce in their section 1983 action.[4] This statutory scheme sets forth a clear and specific plan requiring public housing agencies to eliminate lead paint hazards for children living in public housing, and here, as in *Hunter,* this plainly creates an enforceable right within the meaning of section 1983. At trial, plaintiffs established that PHA failed to comply with the dictates of the provisions and regulations of the USHA and the LBPPPA designed to protect children from lead paint poisoning, and that as a result, minor plaintiffs suffered injury. A jury awarded damages after weighing and considering testimony as to PHA's liability and the harm resulting

4. Plaintiffs in *Hunter* were residents of section 8 housing, while plaintiffs at bar were residents of a public housing project. Accordingly, some of the statutory provisions analyzed by the *Hunter* court detailed a public housing agency's responsibility for section 8 housing, which provisions are irrelevant here.

from minor plaintiffs' lead paint poisoning. The remedy which plaintiffs obtained, as reflected in the jury's monetary award, was fair and reasonable, not vague or amorphous. Consequently, the jury's finding of liability against PHA under plaintiffs' section 1983 civil rights theory was entirely valid and proper.

PHA relies heavily on the United States Supreme Court opinion in *Suter, supra,* to support its contention that no private right of action to enforce the USHA and the LBPPPA may be had under section 1983. PHA cites *Suter* for the proposition that a private right of action under section 1983 may not be had unless the federal statute unambiguously confers such entitlement. This reading of *Suter* is overbroad. Moreover, the facts of *Suter* are readily distinguishable from the facts of the instant case. In *Suter,* the plaintiffs brought a class action for injunctive and declaratory relief under section 1983 alleging violations of the Adoption Assistance and Child Welfare Act of 1980. This Act established a federal program to reimburse a certain percentage of expenses incurred by states in the administration of foster care and adoption services. In return for these federal monies, the Act required the states to make reasonable efforts to prevent removal of children from their homes and to facilitate reunification if removal was necessary. The plaintiffs in *Suter,* who were child beneficiaries of the Act, maintained that the state agency responsible for investigating charges of child abuse and providing services for abused children and their families had failed to make reasonable efforts to preserve and reunite families, in contravention of the Act. A majority of the Supreme Court held there was no private right of action to enforce a state agency's compliance with the Federal Adoption Act. Reviewing the Act, its legislative history, and its regulations, the majority concluded that a state's receipt of federal funds under the Act was conditioned solely upon submission of a plan

providing generally for reasonable efforts, and states were given a great deal of discretion in meeting this reasonable efforts requirement. The court found that the proper remedy for a state's failure to substantially comply with its own plan was the withdrawal of federal funds, not a private action to enforce the Act.

In contrast to *Suter,* the statutory scheme here is markedly clear and specific: the USHA, the LBPPPA, and their regulations impose particular duties upon state agencies and dictate the means by which lead paint hazards are to be eliminated. Rather, it is the United States Supreme Court decisions in *Wright, supra*, and *Wilder, supra,* which are controlling, as the statutory schemes they analyze are more like the statutory scheme here. *Wright* involved the Brooke Amendment to the USHA, by which HUD imposed a ceiling on rent to be charged low income tenants of state public housing projects. The Supreme Court held a private right of action existed under section 1983 to challenge the reasonableness of utility charges imposed under the Brooke Amendment after finding the legislation established specific guidelines and imposed affirmative obligations on public housing authorities. The Boren Amendment to the Medicaid Act was the legislation at issue in *Wilder.* This amendment required states receiving federal funds for Medicaid to reimburse Medicaid providers with payments determined to be "reasonable and adequate." Plaintiffs, who were Medicaid providers, sought to challenge the reimbursement rates set by particular states. Finding that the legislation set forth in some detail the factors to be considered in determining the methods for calculating rates, the court held the amendment's mandate to the states was sufficiently specific and binding so as to create an enforceable right in Medicaid providers under section 1983. The Supreme Court's analysis in both *Wright* and *Wilder* featured application of the three-pronged test. In essence, the court found

that both statutory schemes imposed specific and mandatory requirements on the states which were clearly intended to benefit the particular plaintiffs. This analysis as well as the court's rationale accords with that set forth in *Hunter, supra,* and is equally applicable to the case at bar.

The recent case of *Farley v. PHA,* 102 F.3d 697 (3rd Cir. 1996), also demonstrates the currency of three-pronged analysis. The plaintiff in *Farley,* a public housing tenant, was held to have a cognizable section 1983 claim against defendant PHA to enforce a public housing grievance award she obtained pursuant to section 1437d(k) of the USHA. This provision requires public housing agencies to provide a binding administrative grievance procedure for the resolution of tenant/agency disputes as a condition to receipt of federal funds. It describes the procedure and a tenant's rights under it in detail, and dictates that the public housing agency must comply with the grievance award. The Third Circuit, affirming the lower court, applied the three-pronged test to conclude that section 1437d(k) imposed a clear and specific obligation on public housing agencies to follow a particular grievance procedure and thus conferred enforceable rights within the meaning of section 1983.

PHA also cites the Supreme Court decision in *Pennhurst State School & Hospital v. Halderman,* 451 U.S. 1, 101 S.Ct. 1531 (1981), in support of its contention that a private right of action to enforce a federal statute cannot be implied, as such a condition on the grant of federal money must be unambiguously stated in the statute. PHA's reliance on *Pennhurst* in this case is misplaced. The federal statute at issue there was the Developmentally Disabled Assistance and Bill of Rights Act, which provided federal funding to help

participating states provide proper care and treatment to persons with developmental disabilities. The Act imposed certain conditions on participation in the funding program, such as approval by the Federal Department of Health and Human Services of each state's plan. The Act also contained a "bill of rights" provision which stated that each disabled person under the Act had a right to appropriate treatment, services, and habilitation in the least restrictive setting. The *Pennhurst* plaintiffs sought to enforce this provision of the Act under the theory that the Act itself implied a private right of action. That is, rather than bringing suit under section 1983 based on the state's failure to comply with the Act, plaintiffs sued the state to directly force compliance with the Act. A majority of the Supreme Court found no private right of action could be implied in the Act.

Because *Pennhurst* dealt solely with the issue whether a private right of action to enforce a particular federal statute could be implied in that statute, it is hardly pertinent to analysis of the case at bar. It is worthy of note, however, that in finding no implied right of action under the Developmentally Disabled Assistance and Bill of Rights Act, the Supreme Court entered into an analysis not dissimilar from the standard three-pronged test: the court questioned whether the Act imposed mandatory requirements upon the states and found that although the Act did impose certain requirements such as establishment of an overall administrative plan, it did not impose an obligation to provide treatment in accordance with the bill of rights section. Justice Rehnquist, writing for the majority, held that the Act thus did not create a private right to compel participating states to provide treatment as prescribed in the bill of rights section.