[Cite as *In re S.S.*, 2023-Ohio-1344.]

# IN THE COURT OF APPEALS OF OHIO

SEVENTH APPELLATE DISTRICT
MONROE COUNTY

IN THE MATTER OF S.S.,

A DEPENDENT CHILD.

---

**OPINION AND JUDGMENT ENTRY**
**Case No. 22 MO 0021**

---

Juvenile Appeal from the
Court of Common Pleas, Juvenile Division, of Monroe County, Ohio
Case No. 2021 DNA 5994

**BEFORE:**
David A. D'Apolito, Cheryl L. Waite, Carol Ann Robb, Judges.

---

**JUDGMENT:**
Affirmed.

---

*Atty. James L. Peters*, Monroe County Prosecutor, and *Atty. Jamie A. Riley Pointer,* Assistant Prosecuting Attorney, 101 North Main Street, Room 15, Woodsfield, Ohio 43793, for Appellee and

*Atty. Travis Collins,* 105 Jamison Avenue, Cadiz, Ohio 43907, for Appellant.

Dated: April 25, 2023

**D'APOLITO, P.J.**

**{¶1}** Appellant, W.S. ("Mother"), appeals the October 4, 2022 judgment entry of the Monroe County Court of Common Pleas, Juvenile Division, awarding legal custody of S.S. (d.o.b. – 9/5/13) to L.S. and G.S., S.S.'s maternal grandparents ("Maternal Grandparents") and terminating protective supervision by Monroe County Department of Job and Family Services ("Agency"). In this appeal, Mother concedes that she has not satisfied the requirements for reunification with S.S. She argues instead that the juvenile court should have given her additional time to meet the goals set in the family case plan dated February 9, 2022 and amended family case plan dated September 22, 2022.[1]

**{¶2}** Specifically, Mother asserts that the Agency failed to fulfill its statutory obligation to demonstrate that it made reasonable efforts to facilitate Mother's reunification with S.S. Mother further asserts that the juvenile court abused its discretion in concluding that Maternal Grandparents' legal custody of S.S. was in her best interest, insofar as S.S. had only been in the temporary custody of Maternal Grandparents for roughly ten months when legal custody was awarded. Mother adds that her efforts to comply with the family case plan dated February 9, 2022 were interrupted due to a period of homelessness and the birth of her sixth child.

**{¶3}** For the following reasons, the judgment entry of the juvenile court is affirmed.

## FACTS AND PROCEDURAL HISTORY

**{¶4}** As of the date of the judgment entry on appeal, Mother had six children[2]: M.S. (d.o.b. – unknown, he was ten or eleven at the time of the hearing on the custody motion and is in the permanent custody of Maternal Grandparents due to Mother's inability to manage the medical care required due to M.S.'s diabetes); S.S. (the subject of this appeal); K.S.J. (d.o.b. – 6/7/17); A.S.J. (d.o.b. – 10/2/19); J.S.J. (d.o.b. – 2/17/21);

---

[1] The case plan was amended to include Mother's sixth child, who was born prematurely on August 4, 2022, during the pendency of the original case plan.

[2] Mother suffered a stillbirth in 2013.

and C.S.J. (d.o.b. – 8/4/22). C.S.J. was born during the pendency of the juvenile court proceedings.

{¶5} On December 15, 2021, the Agency filed a complaint alleging that S.S., K.S.J., A.S.J., and J.S.J.[3] were neglected and dependent children. The ex parte emergency shelter care order, filed that same day, reads in pertinent part, "[v]ery volatile home situation with constant domestic violence. [D.S.J.,] Father [of K.S.J., A.S.J. and J.S.J.] ("Fiancé") recently released from psychiatric treatment and not taking medications. Mother was advised that if she returned to the residence with the children that [the Agency] would take action to remove children."

{¶6} On December 17, 2021, the juvenile court issued a judgment entry awarding temporary custody of S.S. to Maternal Grandparents, and ordering protective supervision of the child by the Agency. On February 25, 2022, the juvenile court issued a judgment entry memorializing Mother's stipulation that S.S. was a dependent child, in exchange for the Agency's dismissal of the neglect charge. Maternal Grandparents' custody of S.S. with protective supervision was continued.

{¶7} On August 26, 2022, the Agency filed a motion pursuant to R.C. 2151.353(A)(3)[4] requesting the probate court award legal custody of S.S. to Maternal

---

[3] The juvenile court awarded temporary custody of S.S.'s half-siblings to their paternal aunt. C.S.J. is in the foster system.

[4] R.C. 2151.353, captioned "Disposition of abused, neglected, or dependent child," reads in pertinent part:

> (A) If a child is adjudicated an abused, neglected, or dependent child, the court may make any of the following orders of disposition:
>
> * * *
>
> (3) Award legal custody of the child to either parent or to any other person who, prior to the dispositional hearing, files a motion requesting legal custody of the child or is identified as a proposed legal custodian in a complaint or motion filed prior to the dispositional hearing by any party to the proceedings. A person identified in a complaint or motion filed by a party to the proceedings as a proposed legal custodian shall be awarded legal custody of the child only if the person identified

Case No. 22 MO 0021

Grandparents. In the motion, the Agency asserts that Mother has not made satisfactory progress on her case plan. The motion cites Mother's failure to secure employment and stable housing. The Agency alleges that Mother recently gave birth to an infant born

---

signs a statement of understanding for legal custody that contains at least the following provisions:

(a) That it is the intent of the person to become the legal custodian of the child and the person is able to assume legal responsibility for the care and supervision of the child;

(b) That the person understands that legal custody of the child in question is intended to be permanent in nature and that the person will be responsible as the custodian for the child until the child reaches the age of majority. Responsibility as custodian for the child shall continue beyond the age of majority if, at the time the child reaches the age of majority, the child is pursuing a diploma granted by the board of education or other governing authority, successful completion of the curriculum of any high school, successful completion of an individualized education program developed for the student by any high school, or an age and schooling certificate. Responsibility beyond the age of majority shall terminate when the child ceases to continuously pursue such an education, completes such an education, or is excused from such an education under standards adopted by the state board of education, whichever occurs first.

(c) That the parents of the child have residual parental rights, privileges, and responsibilities, including, but not limited to, the privilege of reasonable visitation, consent to adoption, the privilege to determine the child's religious affiliation, and the responsibility for support;

(d) That the person understands that the person must be present in court for the dispositional hearing in order to affirm the person's intention to become legal custodian, to affirm that the person understands the effect of the custodianship before the court, and to answer any questions that the court or any parties to the case may have.

---

Case No. 22 MO 0021

approximately nine weeks premature [C.S.J.] and Mother "struggles with putting her children's needs ahead of her own desires." (8/26/22 Mot., p. 1.)

**{¶8}** Maternal Grandparents executed a statement of understanding in accordance with R.C. 2151.353 that same day. Maternal Grandparents acknowledged the voluntary nature of their proposed assumption of legal custody of S.S., as well as the residual parental rights of Mother and Father[5], including the right to petition the juvenile court for a modification of the judgment entry awarding permanent legal custody of S.S. to Maternal Grandparents.

**{¶9}** The motion for legal custody came before the juvenile court for hearing on September 30, 2022. The juvenile court accepted the testimony of Jessica Murphy, a children's services caseworker at the Agency and Lisa Swisher, a supervisor at the Agency, who each oversaw S.S.'s case; Judith Bickmeyer, a clinical social worker at Tri-County Help Center and Billie Jo Bishop, a counselor at Southeast Healthcare, who each provided treatment to Mother; Chelsea Bone, the Guardian Ad Litem ("GAL"); and Maternal Grandparents. Mother was present and represented, but did not offer testimony.

**{¶10}** Murphy's assignment to S.S.'s case began in November of 2021 and ended in June of 2022, when she left the Agency. Upon Murphy's departure, Swisher, who supervised S.S.'s case during Murphy's tenure, was assigned to directly oversee S.S.'s case.

**{¶11}** Pursuant to the case plan instituted by the Agency in February of 2022, the following steps were formulated to assist Mother in achieving the goal of reunification with S.S.:

[Mother] will receive an assessment with Tri-County Help Center. Caseworker will make referrals as necessary.

[Mother] will follow any recommendations and treatment plans.

[Mother] will attend appointments.

---

[5] B.S., S.S.'s father ("Father"), has had limited contact with her and is currently under indictment in the Franklin County Court of Common Pleas for sexual assault. He is not a party to this appeal.

[Mother] will address any relationship issues and substance abuse.

(2/9/22 Plan., p. 4.) The plan reads that progress will be measured by "[c]ontacts with caseworker on a regular basis," and "[m]inimum of monthly contacts with caseworker."

{¶12} The plan acknowledges the following "needs/concerns:"

There is ample information that the relationship between [Fiancé and Mother] is to some extent domestically violent. Furthermore, on more than one occasion [Mother] did reach out for help to leave the home with the children, but only for brief periods of time and would return quickly to the home. Not only does this type of environment expose the children to the chaos of intimate partner violence, it also creates on overall unstable and chaotic home environment.

{¶13} The plan further acknowledges that Fiancé recently underwent a psychiatric evaluation. He was admitted to the psychiatric facility voluntarily, but he was retained involuntarily. There was no follow-up nor medication management. Although Fiancé denied use of anything other than prescribed medical marijuana, reports suggested that he abused methamphetamine. His history of mood swings, violent/aggressive outbursts, impulsiveness, and paranoid thoughts is consistent with methamphetamine abuse.

{¶14} Of equal concern, the couple is prone to arguments that escalate to physical violence. On one such occasion, Fiancé ousted Mother from the residence during a winter evening, and Mother was found the following morning sleeping on a bench at the General Store in Lewisville. It is not clear from the record whether Mother was pregnant with C.S.J. at the time. Moreover, the plan observes that Fiancé is very controlling of Mother, frequently dictating her actions and instructing her how to respond and react.

{¶15} In addition to the couple's history of acrimony and domestic violence, Murphy testified that she was very concerned about Mother's substance abuse and mental health. Murphy recommended evaluation and treatment.

{¶16} Murphy testified that she began assisting Mother with service linkage prior to the development of the case plan, which included referrals to Tri-County Help Center in St. Clairsville and Southeast Healthcare in Woodsfield. Murphy further testified that

service providers often have a lengthy wait list, so it is common practice at the Agency to make referrals to more than one service provider.

**{¶17}** Murphy explained that Mother failed to participate in treatment services in the winter of 2022. According to Murphy, Mother was preoccupied with a physical move from Fiancé's home in Lewisville to Maternal Grandparents' home in Sardis. Mother frequently left then returned to Fiancé's home throughout the attempted implementation of the case plan. Murphy recommended Ohio Hills Health Service in Barnesville, or in the alternative, virtual sessions with Tri-County, but Mother did not participate in either program.

**{¶18}** Swisher added that the first several months of the case plan were chaotic due to Mother's relationship with Fiancé. Swisher testified, "[Mother] was with him, then she was leaving him, and then she was spending the night on park benches, and then she was back in the home." (9/30/22 Hrg. Tr., p. 125.)

**{¶19}** Although Murphy maintained communication with Mother, Murphy testified that Mother did not participate in any mental health or substance abuse treatment programs prior to Murphy's departure from the Agency in June of 2022. Further, Mother was unwilling to disclose the violence occurring in the Lewisville household, which was established by the Agency through the statements of family members and police reports.

**{¶20}** Murphy conceded that Mother was not required to leave Fiancé's residence in Lewisville as a part of the case plan. She further conceded that Mother spent several days at a domestic violence shelter during the pendency of this case, at which time Mother lost touch with the Agency.

**{¶21}** Murphy described the effect of Mother's various personal and emotional problems and her tumultuous relationship with Fiancé on S.S. as "constant instability." (*Id.*, p. 9.) For instance, "prior to November [of 2021], there were instances where [S.S.] would be dis-enrolled from Skyvue Elementary [School in Graysville, Ohio], enrolled in River [Elementary School in Hannibal, Ohio] for a day, missing school days, and then in November * * * it happened again. [Mother] left the home she shared with [Fiancé] in Lewisville. There was police involvement, and [S.S.] was again enrolled in a different school and being taken to [Maternal Grandparents' home] in Sardis." (*Id.*, p. 9.)

{¶22} Murphy testified that S.S. was displaying aggressive behaviors when she was placed in the temporary custody of Maternal Grandparents. However, as the case progressed, S.S. became more settled and her behaviors at school improved through the end of the school year in May.

{¶23} At some point in early 2022, Mother began residing with Maternal Grandparents. Murphy described Mother's return to the home as "a little bit of unsettling * * *a change for [S.S.] – yet another change, that she had to go through." (*Id.*, p. 17.) Murphy ultimately opined that it was in S.S.'s best interest to remain with Maternal Grandparents.

{¶24} Bickmeyer testified that she first encountered Mother with Fiancé during a crisis session at Tri-County on December 21, 2021, after Mother lost custody of her children. Mother reported that the couple "bickered," but she denied any physical violence. She claimed that custody of her four children was temporarily reassigned due to a drain problem that prevented the children from bathing and a lack of reliable transportation. Mother canceled a scheduled appointment with Bickmeyer on January 11, 2022.

{¶25} Bickmeyer performed a diagnostic assessment of Mother on February 1, 2022. At a session on February 15, 2022, Mother reiterated that the children were removed from Mother's care due to "drain problems." However, she later conceded that she regularly consumed alcohol in the evenings, and as a result, she was unable to prepare the children for school the following mornings, which resulted in numerous absences. At the February 15, 2022 session, Mother reported she and Fiancé were attending Alcoholics Anonymous meetings and attending parenting classes online. Mother further reported that she had not consumed alcohol since December 20 or 23, 2021. (2/15/22 clinical notes, p. 1.)

{¶26} Bickmeyer conducted telephone sessions with Mother on March 15 and April 12, 2022, due to Mother's stated difficulty in arranging transportation to the facility. According to Bickmeyer, Mother was forthcoming about her problems despite her initial efforts to conceal them.

{¶27} Mother did not appear for scheduled sessions on March 1, April 5, and May 3, 2022. On May 17, 2022, Mother called and rescheduled a morning session to the

afternoon, but did not appear for the rescheduled session. (*Id.*, p. 32.) Mother's file at Tri-County was closed three months after her last appointment, and Mother made no effort to continue treatment at Tri-County. (*Id.*, p. 33.)

{¶28} Swisher assumed direct responsibility for S.S.'s case in June of 2022. Swisher's first in-person meeting with Mother was on August 1, 2022. Mother confirmed that she had not participated in mental health or drug and alcohol counseling during the previous three months.

{¶29} Swisher testified that Mother continually talks about wanting to return to Fiancé's home. However, Swisher has repeatedly explained to Mother that her relationship with Fiancé is toxic, and it creates a dangerous environment for her children.

{¶30} Bishop testified that Mother underwent an intake assessment at Southeast on August 2, 2022. C.S.J., Mother's youngest child, was born two days later.

{¶31} The intake assessment at Southeast was originally scheduled on December 23, 2021, but the assessment was not performed. There was no explanation in Southeast's records, so it is not clear if Mother canceled the assessment or simply did not appear. During the assessment conducted on August 2, 2022, Mother reported undergoing treatment at Tri-County.

{¶32} As a result of the assessment, Mother was diagnosed with major depressive order, recurrent, mild; generalized anxiety disorder; opiate abuse, uncomplicated; and alcohol abuse disorder. Bishop explained the opiate abuse was a historical diagnosis, as Mother warranted that she had not abused "hard drugs" since 2012, despite conceding that she has tested positive for Methamphetamine, Xanax, and Ecstasy after 2012. Mother further warranted that she had not consumed alcohol since May of 2022, which establishes that Mother did consume alcohol while she was pregnant with C.S.J.

{¶33} Bishop conducted six sessions with Mother – August 19, August 22, August 26, August 29, September 20, and September 26, 2022, which included four telephone sessions as Mother was located in Morgantown following the birth of C.S.J. Mother had a seventh session with Bishop scheduled for the Monday following the hearing, and an appointment to begin alcohol and drug treatment on October 11, 2022.

{¶34} Bishop explained that she is working with Mother to address Mother's problem-solving, decision-making, impulsivity, distress-tolerance level, anger

management, and parenting skills. Mother has been working on communication, social skills, "being able to recognize when [she is] not thinking logically and [she is] reacting on the emotional level[,] * * * understanding what her feelings are." (*Id.*, p. 49.)

{¶35} Bishop further explained that Mother wanted Fiancé to "get involved with therapy," however Bishop encouraged Mother to consider family therapy with "[Mother], the kids, and [Maternal Grandparents]." Bishop added that Mother has "a lot of resentment towards [Maternal Grandmother]."

{¶36} Bishop testified that she has attempted to address Mother's past drug and alcohol abuse, but Mother patently denies her past substance abuse. Bishop further testified that she has insisted that Mother personally attend sessions after Mother returned from Morgantown. Bishop encouraged Mother to spend as much time as possible with C.S.J. while she was in Morgantown, however Bishop was not confident that Mother complied. C.S.J. was in foster care on the date of the hearing. Upon Mother's return from Morgantown, Bishop has insisted on in-person sessions and offered Mother several methods of publicly-subsidized transportation to Southeast.

{¶37} According to Bishop, Mother "kind of comes across as defeated a little, with regards to life in general." Bishop testified that Mother appears to be very open when questioned, however Bishop is not certain whether Mother is being completely honest. Bishop described Mother as "very compliant" since August. Although a release was completed for Tri-County's records, the records had not been obtained by Southeast.

{¶38} Bishop was asked if she could provide a timeline for Mother's recovery. Bishop replied that therapy is ongoing, and based on two months of sessions with Mother, Bishop could not forecast whether Mother would ever be capable of reunification with her children. Bishop explained that Mother had been assigned a case manager, who would perform home visits, help with organization and decision-making, and stay abreast of Mother's legal issues.

{¶39} Swisher similarly testified Mother's therapy sessions with Bishop in August of 2022 had in no way prepared her to regain custody of her children. Swisher testified that it is in S.S.'s best interest to be in the legal custody of Maternal Grandparents.

{¶40} Maternal Grandmother testified that S.S. had been living with Maternal Grandparents since December 7 or 8, 2021. S.S. and Mother lived with Maternal

Grandparents for the first seven years of S.S.'s life, that is, until Mother and S.S. moved to Lewisville in June of 2020 to cohabitate with Fiancé and their shared children.

**{¶41}** According to Maternal Grandmother, S.S. suffered from nightmares when she first returned, which S.S. attributed to Fiancé locking S.S. in the bathroom at his house. S.S. also exhibited strange behavior at school after being placed with Maternal Grandparents. S.S. was "acting like a cat," but Maternal Grandparents "nipped that in the bud." (*Id.*, p. 66-67.) According to Maternal Grandmother, S.S. was "just playing around."

**{¶42}** S.S. was held back at the beginning of the 2022 school year as a result of the missed time in 2021. She cannot read or write very well, however, an Individualized Education Plan was implemented at her current school, and her skills are improving.

**{¶43}** Maternal Grandparents have made efforts to maintain monitored telephone contact between S.S. and Father. S.S. talked to Father one time and has since refused to speak with him.

**{¶44}** Maternal Grandmother testified that Maternal Grandparents are in good health and able to care for S.S. for the next nine years. They intended to pursue health insurance for S.S. through Maternal Grandfather's employment after legal custody was awarded.

**{¶45}** Maternal Grandmother testified that Mother returned to live with Maternal Grandparents at some point after December of 2021, because they did not want her to reside in a homeless shelter. Mother originally resided in Maternal Grandparents' basement. However, one evening Mother reported seeing Fiancé on the bed in the basement, and she has slept on the first-floor couch from that day forward.

**{¶46}** Although Mother assists Maternal Grandmother in preparing S.S. and her brother for school, Maternal Grandmother washes their clothes and prepares their meals. Maternal Grandmother testified that her relationship with Mother is good, but also tense at times. Mother accuses Maternal Grandmother of "succeed[ing] [at getting S.S]." Maternal Grandmother acknowledged that Mother is permitted to spend time with the children, however, Mother's time with the children is supervised by Maternal Grandparents pursuant to a recommendation by the Agency.

**{¶47}** Maternal Grandfather testified that he requested time away from work in order to drive Mother to her treatment appointments in August and September of 2022. He explained that her treatment is his responsibility because he is her parent.

**{¶48}** Swisher testified to an incident between S.S. and Mother roughly three weeks prior to the hearing, during which time Mother was in active counseling. Mother's oldest child arrived at school with scratch marks on his neck. According to Mother's oldest child and S.S., S.S. refused to complete her homework and called Mother a "stupid bitch." Mother attempted to "smack" S.S., Mother's oldest child (age ten or eleven) intervened, and Mother wrapped her arm around his neck and took him to the ground.

**{¶49}** When confronted by Swisher, Mother "minimized" the incident "and kind of laughed about it." Swisher conceded on cross-examination that Mother was never told that she was not permitted to discipline S.S.

**{¶50}** Swisher clarified that she never informed Maternal Grandparents that Mother should be supervised when she was with S.S. Supervision was only required when Mother's younger children were visiting. However, after the foregoing incident, Swisher informed Maternal Grandparents that Mother must be supervised when she is with any of the children. The requirement of supervision, coupled with the length of Mother's stay with Maternal Grandparents, has strained their relationship.

**{¶51}** Swisher testified that she did not object to Mother seeing the children around the house, but she recommended that Maternal Grandparents be awarded legal custody of S.S. due to Mother's lack of progress with the case plan.

**{¶52}** The GAL observed that communication with S.S. can be very difficult, but that her communication skills have improved since she returned to Maternal Grandparents' home. During the GAL's first visit with S.S., S.S. "climbed up [her] leg like a cat." (*Id.*, p. 140.) More recently, when the GAL specifically asked S.S. where she wants to live, S.S. responded that she feels safe in Maternal Grandparents' home. On cross-examination, the GAL conceded that Mother was living in Maternal Grandparents' home when S.S. indicated that she felt safe there. The GAL's last communication with S.S. was in June of 2022.

**{¶53}** On October 4, 2022, the trial court issued a judgment entry awarding legal custody of S.S. to Maternal Grandparents. The one-and-a-half page entry reads, in relevant part:

> The Court heard testimony from a number of witnesses. The overwhelming weight of the testimony shows that [Mother] has not made significant progress toward the goals set forth in her case plan. * * * Since birth[,] this child has lived the great majority of her life in the home of [Maternal Grandparents]. [Mother] also resided with [Maternal Grandparents] for much of that time.

**{¶54}** This timely appeal followed.

## LAW

**{¶55}** Legal custody is governed by R.C. 2151.353(A)(3). Under the statute, a juvenile court may award legal custody of a child who has been adjudicated dependent "to either parent or to any other person who, prior to the dispositional hearing, files a motion requesting legal custody of the child or is identified as a proposed legal custodian in a complaint or motion filed prior to the dispositional hearing by any party to the proceedings."

**{¶56}** "Legal custody" is defined as:

> [A] legal status that vests in the custodian the right to have physical care and control of the child and to determine where and with whom the child shall live, and the right and duty to protect, train, and discipline the child and to provide the child with food, shelter, education, and medical care, all subject to any residual parental rights, privileges, and responsibilities.

R.C. 2151.011(B)(21).

**{¶57}** "[L]egal custody is significantly different than the termination of parental rights." *In re So.P.,* 8th Dist. Cuyahoga No. 111468, 2022-Ohio-4015, ¶ 19. Unlike a case in which parental rights are terminated, when a parent loses legal custody of his or her

child, the parent "retains residual parental rights, privileges and responsibilities and is not permanently foreclosed from regaining custody." *In re M.S.*, 8th Dist. Cuyahoga No. 108567, 2019-Ohio-5128, ¶ 32, citing *In re T.R.*, 8th Dist. Cuyahoga No. 102071, 2015-Ohio-4177, ¶ 32, *In re G.M.*, 8th Dist. Cuyahoga No. 95410, 2011-Ohio-4090, ¶ 14, and R.C. 2151.353(A)(3)(c).

{¶58} In such a case, a parent's right to regain custody is not permanently foreclosed. *In re M.J.M.,* 8th Dist. Cuyahoga No. 94130, 2010-Ohio-1674, ¶ 12. For this reason, the Eighth District has observed, the standard the juvenile court applies in making its determination is the less restrictive preponderance of the evidence standard. "Preponderance of the evidence" means evidence that is more probable, more persuasive, or of greater probative value. *In re C.V.M.*, 8th Dist. Cuyahoga No. 98340, 2012-Ohio-5514, ¶ 7.

{¶59} There is no "specific test or set of criteria" that must be applied or considered when determining what is in a child's best interest on a motion for legal custody. *In re T.R.*, 2015-Ohio-4177, at ¶ 48. Unlike permanent custody cases in which the juvenile court must consider the factors outlined in R.C. 2151.414(D), R.C. 2151.353(A)(3) does not specify the factors to be considered in determining what is in a child's best interest on a request for legal custody. *In re G.M.*, 2011-Ohio-4090, at ¶ 15.

{¶60} Nevertheless, the Eighth District has held that the R.C. 2151.414(D) best interest factors may be "instructive" in making that determination. See, e.g., *In re V.P.*, 8th Dist. Cuyahoga No. 109649, 2020-Ohio-5626, ¶ 32; *In re D.T.*, 8th Dist. Cuyahoga Nos. 100970 and 100971, 2014-Ohio-4818, ¶ 20, citing *In re E.A.*, 8th Dist. Cuyahoga No. 99065, 2013-Ohio-1193, ¶ 13. The best interest factors include, for example, the interaction of the child with the child's parents, relatives, and caregivers; the custodial history of the child; the child's need for a legally secure permanent placement; and whether a parent has continuously and repeatedly failed to substantially remedy the conditions causing the child to be placed outside the child's home. R.C. 2151.414(D).

{¶61} Courts have also looked to the best interest factors set forth in R.C. 3109.04(F) as a potential guide in determining what is in a child's best interest for purpose of a motion for legal custody. See, e.g., *In re J.O.*, 8th Dist. Cuyahoga No. 87626, 2007-Ohio-407, ¶ 11. Such factors include, but are not limited to, the wishes of the child's

parents regarding the child's care, the child's interaction and interrelationships with the child's parents, siblings and any other person who may significantly affect the child's best interest, the child's adjustment to home, school and community, the mental and physical health of all persons involved in the situation, and the extent to which court-approved visitation and companionship rights are likely to be honored and facilitated. R.C. 3109.04(F).

**{¶62}** When a juvenile court considers an award of legal custody following an adjudication of abuse, neglect, or dependency, it does so by examining what would be in the best interest of the child based on a preponderance of the evidence. Thus, this Court applies a preponderance of the evidence standard of appellate review to the juvenile court's factual findings on a request for legal custody. *In re W.A.J.*, 8th Dist. Cuyahoga No. 99813, 2014-Ohio-604, ¶ 2.

**{¶63}** However, the decision whether to grant or deny a request for legal custody is within the sound discretion of the juvenile court. When reviewing a juvenile court's ultimate decision on whether the facts as determined would make it in the child's best interest to be placed in legal custody, this Court applies an abuse of discretion standard. *In re W.A.J.* at ¶ 2. Such an abuse implies that the court's attitude is unreasonable, arbitrary or unconscionable. *Blakemore v. Blakemore*, 5 Ohio St.3d 217, 219, 450 N.E.2d 1140 (1983).

## ANALYSIS

## ASSIGNMENT OF ERROR NO. 1

**THE TRIAL COURT ERRED IN FINDING THAT [THE AGENCY] HAD USED REASONABLE EFFORTS TO REUNIFY [MOTHER] AND S.S. AND FAILED TO MAKE SPECIFIC FINDINGS OF FACT IN ITS ORDER AS TO WHAT SERVICES WERE PROVIDED TO [MOTHER] AND WHY THOSE SERVICES DID NOT PREVENT THE REMOVAL OF THE CHILD FROM THE CHILD'S HOME OR ENABLE THE CHILD TO RETURN SAFELY HOME.**

{¶64} R.C. 2151.419, captioned "Hearings on efforts of agencies to prevent removal of children from homes," reads, in relevant part:

(A)(1) Except as provided in division (A)(2) of this section, at any hearing held pursuant to section 2151.28, division (E) of section 2151.31, or section 2151.314, 2151.33, or 2151.353 of the Revised Code at which the court removes a child from the child's home or continues the removal of a child from the child's home, the court shall determine whether the public children services agency or private child placing agency that filed the complaint in the case, removed the child from home, has custody of the child, or will be given custody of the child has made reasonable efforts to prevent the removal of the child from the child's home, to eliminate the continued removal of the child from the child's home, or to make it possible for the child to return safely home. The agency shall have the burden of proving that it has made those reasonable efforts.

* * *

(B)(1) A court that is required to make a determination as described in division (A)(1) or (2) of this section shall issue written findings of fact setting forth the reasons supporting its determination. If the court makes a written determination under division (A)(1) of this section, it shall briefly describe in the findings of fact the relevant services provided by the agency to the family of the child and why those services did not prevent the removal of the child from the child's home or enable the child to return safely home.

{¶65} Mother argues that both the Agency and the juvenile court failed to fulfill their respective duties set forth in R.C. 2151.419. Mother cites *In re G.M.*, 5th Dist. Muskingum No. CT2013-0038, 2014-Ohio-1595, for the proposition that reversal is warranted where a reviewing court is unable to determine "which services appellee provided to appellant and why those services did not * * * enable the child to return safely to the home." Id. at ¶ 11. However, in *In re Biery*, 7th Dist. Belmont No. 99-BA-44, 2001-Ohio-3186, this Court observed that the lower court's failure to comply with the statute

did not constitute reversible error, particularly where the reasonableness of the Agency's efforts could be gleaned from the record. *Id.* at 4.

{¶66} Here, the Agency provided Mother with referrals to two separate facilities. Murphy maintained contact with Mother, despite Mother's failure to capitalize on the opportunities for treatment. Mother attempts to shift the blame for her failure to maintain a consistent treatment regimen to the Agency and Mother's pregnancy, when the record reflects that Mother eschewed numerous opportunities for treatment arranged by the Agency during the first seven months of 2022 in favor of perpetuating her turbulent relationship with Fiancé.

{¶67} As a consequence, we find the Agency fulfilled its statutory duty to demonstrate its reasonable efforts to eliminate the continued removal of S.S. from Mother's home, and the trial court did not commit reversible error when it did not briefly describe the Agency's efforts, insofar as they are plainly evident from the record. Accordingly, we further find that the first assignment of error has no merit.

## ASSIGNMENT OF ERROR NO. 2

**THE TRIAL COURT ABUSED ITS DISCRETION BY FINDING THAT IT WAS IN S.S.'S BEST INTERESTS TO GRANT LEGAL CUSTODY TO [MATERNAL GRANDPARENTS.]**

{¶68} Based on Mother's consistent compliance with the case plan in the months of August and September of 2022, Mother contends that the juvenile court abused its discretion in awarding legal custody to Maternal Grandparents. Mother argues that she began regular counseling sessions immediately following the birth of C.S.J., so she should have been provided more time to meet the goals of the plan and the amended plan prior to the award of legal custody of S.S. to Maternal Grandparents.

{¶69} While it is true that Mother participated in the recommended counseling sessions in August and September of 2022, she failed to comply with case plan during the first six months of its existence. Mother attributes her failure to fulfill counseling requirements to her pregnancy, however, her pregnancy did not prohibit her from maintaining her relationship with Fiancé and moving in and out of his home.

Case No. 22 MO 0021

{¶70} Although Mother's newfound commitment to treatment is laudable, Bishop conceded that it is uncertain that Mother will ever be able to regain custody of S.S. In the meantime, there is no dispute that residing with Maternal Grandparents has stabilized S.S.'s daily routine. Both agency representatives and the GAL observed that S.S.'s mood and behavior have improved since she began consistently residing with Maternal Grandparents. Although Mother has been present intermittently in Maternal Grandparents' home during that time, it is clear that Maternal Grandmother is S.S.'s primary caretaker. Further, it is undisputed that S.S.'s educational challenges (exacerbated in some measure to Mother's inability to facilitate S.S.'s consistent attendance in 2021) are being addressed at her current school. An IEP has been formulated and Maternal Grandparents ensure that S.S. regularly attends classes. The award of legal custody to Maternal Grandparents provides them with the ability to make informed and thoughtful decisions regarding S.S.'s medical care and education.

{¶71} Of equal import, Mother's ability to regain custody has not been foreclosed by the judgment entry on appeal. If Mother can meet the case plan goals in the future, she can petition the juvenile court for a reallocation of parental rights.

{¶72} Accordingly, we find the juvenile court did not abuse its discretion in awarding legal custody of S.S. to Maternal Grandparents, and further the second assignment of error has no merit.

## CONCLUSION

{¶73} The judgment entry of the juvenile court awarding legal custody of S.S. to Maternal Grandparents is affirmed.

Waite, J., concurs.

Robb, J., concurs.

Case No. 22 MO 0021

[Cite as *In re S.S.*, 2023-Ohio-1344.]

_____

For the reasons stated in the Opinion rendered herein, the assignments of error are overruled and it is the final judgment and order of this Court that the judgment of the Court of Common Pleas, Juvenile Division, of Monroe County, Ohio, is affirmed. Costs to be waived.

A certified copy of this opinion and judgment entry shall constitute the mandate in this case pursuant to Rule 27 of the Rules of Appellate Procedure. It is ordered that a certified copy be sent by the clerk to the trial court to carry this judgment into execution.

## NOTICE TO COUNSEL

**This document constitutes a final judgment entry.**