[Cite as *In re A.W.*, 2025-Ohio-2563.]

IN THE COURT OF APPEALS OF OHIO
THIRD APPELLATE DISTRICT
HANCOCK COUNTY

IN RE:

    A.W.,

ADJUDICATED NEGLECTED
 AND
DEPENDENT CHILD.

[ISAAC W. - APPELLANT]

CASE NO. 5-24-30


OPINION AND
JUDGMENT ENTRY


Appeal from Hancock County Common Pleas Court
Juvenile Division
Trial Court No. 2023 AND 0043

Judgment Affirmed

Date of Decision: July 21, 2025


APPEARANCES:

    *Howard A. Elliott* for Appellant

    *Justin Kahle* for Appellee

**MILLER, J.**

{¶1} Isaac W., father of A.W., appeals the July 25, 2024 judgment of the Hancock County Court of Common Pleas, Juvenile Division, placing A.W. in the legal custody of Cora Altvater ("Altvater"). For the reasons that follow, we affirm.

*Facts and Procedural History*

{¶2} Isaac W. is the biological father of A.W., born March 2008. A.W.'s biological mother is deceased. On October 25, 2023, the Hancock County Department of Job and Family Services ("the Agency") filed a complaint alleging A.W. was a neglected and dependent child pursuant to R.C. 2151.03(A)(2), (3), and (6) and R.C. 2151.04(C), respectively, and requesting the trial court place A.W. in its protective supervision. Specifically, the complaint alleged that Isaac repeatedly left A.W. alone in their home for days and weeks at a time without appropriate supervision or food. Furthermore, the complaint purported that Isaac routinely brought A.W. to a property where Isaac manufactured, used, and sold drugs.

{¶3} Following an adjudication hearing held on December 21, 2023, the trial court found A.W. to be a neglected and dependent child. A.W. was placed in the temporary custody of the Agency. At the disposition hearing on January 9, 2024, A.W. was continued in the temporary custody of the Agency. Shortly thereafter, A.W. was placed in the temporary custody of Altvater, a kinship placement with the Agency continuing protective supervision.

{¶4} On April 23, 2024, the Agency filed a motion to place A.W. in the legal custody of Altvater, terminate protective supervision, and close the case. A hearing was held on July 25, 2024 on the Agency's motion for legal custody. At the hearing, the caseworker, Jessica Achey ("Achey"), testified that the Agency became involved with Isaac and A.W. when they received reports that Isaac was leaving A.W. locked in the home for days with minimal supervision or supplies. (July 25, 2024 Tr. at 8). Additionally, the Agency received reports that Isaac was taking A.W. to a residence where he manufactured, sold, and used cocaine. (*Id.*).

{¶5} The Agency filed a case plan which included services for Isaac to complete, including mental-health and substance-abuse assessments and services, attending a parenting-education class, securing safe and stable housing for A.W., and visitation. (*Id.* at 9). Achey testified that Isaac completed a parenting-education class in February 2024 and was discharged from mental health and substance abuse services in June 2024. (*Id.* at 10).

{¶6} However, Achey stated that Isaac had no visitation with A.W. throughout the pendency of the case. (*Id.* at 10, 16). In fact, despite the Agency sending a referral to Harmony House, a supervised visitation facility, shortly after the case was opened, Isaac had not completed his intake paperwork for Harmony House until May 2024. (*Id.* at 10, 14-15). The Agency also sent a visitation referral to another facility and no visitation occurred at that location, either. (*Id.* at 14-15).

Moreover, Isaac did not engage in any phone conversations or other forms of contact with A.W. (*Id.* at 16-17).

**{¶7}** With respect to securing safe and stable housing, Achey reported that Isaac was currently living in the home of his fiancée, Teresa Trimble ("Trimble"), and Trimble reached out to the Agency to inform them that A.W. was "not welcome in her home." (July 25, 2024 Tr. at 10-12). According to Achey, Isaac "agreed with" Trimble, but also told Achey that he was planning to move to South Carolina into a home where A.W. would presumably be welcome. (*Id.* at 11-13). However, Achey testified that Isaac told her that he was not job searching in South Carolina and had not secured housing there. (*Id.* at 12-13).

**{¶8}** Achey testified that it was not possible for Isaac to complete the case plan and reunify in the instant case because he failed to secure safe and stable housing for A.W. and made no attempt to visit with A.W. Furthermore, Achey characterized Isaac and A.W.'s relationship as "very strained and negative." (*Id.* at 19-20).

**{¶9}** Achey described the reasonable efforts the Agency made to finalize permanency in the case such as information referrals, case plan management, visitation referrals, connecting Isaac with career counseling services, placing A.W. with a kinship caregiver, performing home studies, providing drug screens for Isaac, and providing financial assistance to the caregiver. (*Id.* at 20-21). According to Achey, A.W. was well adjusted in Altvater's home and the Agency believed that

granting legal custody of A.W. to Altvater was in A.W.'s best interest. (*Id.* at 25-26).

**{¶10}** Altvater testified that A.W. had been residing in her home since January 23, 2024. (July 25, 2024 Tr. at 41). Altvater stated that, in the time that A.W. had been in her home, no visitations occurred between Isaac and A.W., despite Altvater's willingness to facilitate any such visitation by providing transportation and encouraging A.W. to attend. (*Id.* at 42, 48). Altvater stated that A.W. is well adjusted in her home and gets along well with the other children living in the home. (*Id.* at 43).

**{¶11}** The Court Appointed Special Advocate ("CASA") recommended that A.W. remain in the care of Altvater. (*Id.* at 58). The CASA reported that A.W. is "doing very well" and is "very happy" in Altvater's house and is well bonded with Altvater. (*Id.*).

**{¶12}** At the conclusion of the hearing, the trial court found the Agency had made reasonable efforts to avoid the continued removal of A.W. from her home. (July 25, 2024 Tr. at 62). Specifically, the trial court found that the Agency provided case management, mental-health and substance-abuse assessments and services, parent education, and visitation. (*Id.* at 62-63). The trial court made a further finding that Isaac "abandoned" A.W. and noted that "[t]hroughout [the] entire hearing, he has failed to even look in the direction of his child." (*Id.* at 63). The

trial court stated that Isaac has "clear contempt" for A.W. and "uses derogatory names towards her." (*Id.*).

**{¶13}** The trial court found it was in the best interest of A.W. to be placed in the legal custody of Altvater and that it would be contrary to A.W.'s welfare to return her to Isaac's home. (*Id.* at 63). Additionally, the trial court found it was reasonable that A.W. not be required to have visitation with Isaac based on Isaac's behavior throughout the case and "abandonment" of A.W. unless and until A.W. desired to have visitation with him. (*Id.* at 64-65). The trial court then closed the case. (*Id.* at 64). That same day, the trial court filed its judgment entry memorializing its decision.

**{¶14}** On July 30, 2024, Isaac filed a notice of appeal. He raises two assignments of error for our review.

### First Assignment of Error

**The trial court erred in considering reasonable effort findings by simply stating the services provided by Children Protective Services Unit without setting forth with specificity why the services did not prevent the removal and return of the child to the father's home.**

### Second Assignment of Error

**The Children's Protective Services Unit failed to use reasonable efforts in an attempt to reunify the father and child by not providing any counseling between parent and child, requiring a remand of the case to the trial court.**

{¶15} In his assignments of error, Isaac argues that the trial court erred by finding that the Agency engaged in reasonable efforts to prevent the continued removal of A.W. from the home.

*Relevant Law*

{¶16} "When the state intervenes to protect a child's health or safety, 'the state's efforts to resolve the threat to the child before removing the child or to permit the child to return home after the threat is removed are called "reasonable efforts."'" *In re C.F.*, 2007-Ohio-1104, ¶ 28, quoting Will L. Crossley, *Defining Reasonable Efforts: Demystifying the State's Burden Under Federal Child Protection Legislation*, 12 B.U.Pub.Int.L.J. 259, 260 (2003).

{¶17} "[V]arious sections of the Revised Code refer to the agency's duty to make reasonable efforts to preserve or reunify the family unit," most notably R.C. 2151.419. *Id*. at ¶ 29. Under R.C. 2151.419, when a trial court

> removes a child from the child's home or continues the removal of a child from the child's home, the court shall determine whether the public children's services agency . . . has made reasonable efforts to prevent the removal of the child from the child's home, to eliminate the continued removal of the child from the child's home, or to make it possible for the child to return safely home.

R.C. 2151.419(A)(1).

{¶18} "'Reasonable efforts means that a children's services agency must act diligently and provide services appropriate to the family's need to prevent the child's removal or as a predicate to reunification.'" *In re H.M.K.*, 2013-Ohio-4317,

¶ 95 (3d Dist.), quoting *In re D.A.*, 2012-Ohio-1104, ¶ 30 (6th Dist.). However, "'"[r]easonable efforts" does not mean all available efforts. Otherwise, there would always be an argument that one more additional service, no matter how remote, may have made reunification possible.'" *Id.*, quoting *In re M.A.P.*, 2013-Ohio-655, ¶ 47 (12th Dist.). "[T]he meaning of 'reasonable efforts' 'will obviously vary with the circumstances of each individual case.'" *In re C.B.C.*, 2016-Ohio-916, ¶ 76 (4th Dist.), quoting *Suter v. Artist M.*, 503 U.S. 347, 360, 112 S.Ct. 1360 (1992). "We also note that the statute provides that in determining whether reasonable efforts were made, the child's health and safety is paramount." *In re T.S.*, 2015-Ohio-1184, ¶ 27 (3d Dist.), citing R.C. 2151.419(A)(1).

*Analysis*

{¶19} In his first assignment of error, Isaac alleges that the trial court did not make specific enough findings as to why the Agency's reasonable efforts did not facilitate the return of A.W. In his second assignment of error, Isaac alleges the trial court erred by finding the Agency employed reasonable efforts to prevent the continued removal of A.W. because the Agency did not require A.W. and Isaac to complete counseling services together.

{¶20} In addition to the findings the trial court made at the conclusion of the July 25, 2024 hearing, the trial court memorialized its findings in its attendant judgment entry as follows:

[Isaac] has abandoned the child, uses derogatory language when referring to her, refused to look at the child while in her presence in the courtroom, has failed to visit with the child when able to do so and has shown contempt for the child throughout this case[.]

[The Agency] has made reasonable efforts to avoid the continued removal of the child from her home. [The Agency] has provided case management, a home study, a relative placement, mental health and substance abuse counseling, parent education and visitation[.]

It would be contrary to the welfare of the child to return [her] to her home at this time[.]

(Doc. No. 41).

**{¶21}** Isaac argues that the trial court failed to make specific enough findings of its reasonable efforts. R.C. 2151.419(B)(1) provides that "[i]f the court makes a written determination under [R.C. 2151.419(A)(1), it shall briefly describe in the findings of fact the relevant services provided by the agency to the family of the child and why those services did not prevent the removal of the child from the child's home or enable the child to return safely home." Isaac argues that the trial court failed to comply with R.C. 2151.419(B)(1), and he cites *In re G.M.*, 2014-Ohio-1595 (5th Dist.), for the premise that reversible error occurs where a reviewing court is not able to determine "which services appellee provided to appellant and why those services did not . . . enable the child to return safely to the home." *Id.* at ¶ 11.

**{¶22}** Here, however, the efforts taken by the Agency and the reasons that the efforts were unsuccessful in returning A.W. to Isaac's home are abundantly

apparent from the record. *See In re S.S.*, 2023-Ohio-1344, ¶ 65-67 (7th Dist.) ("the lower court's failure to comply with the statute did not constitute reversible error, particularly where the reasonableness of the Agency's efforts could be gleaned from the record."). In addition to case management, parent education, and substance abuse counseling, the Agency provided Isaac with referrals to two visitation facilities, provided a case plan that included objectives for Isaac to have visitation with A.W. and to procure safe and stable housing for her. The judgment entry and the record clearly demonstrate that Isaac failed to make any effort to have visitation with A.W. and continued residing in a home where A.W. was expressly not welcome. Furthermore, the record indicates that Isaac's "clear contempt" for A.W. was evident from his behavior at the legal custody hearing, where his refusal to even look at A.W. was sufficiently obvious that the trial court noted this behavior in the judgment entry in support of its conclusion that Isaac "abandoned" A.W. Thus, we find that the efforts the Agency took to prevent A.W.'s continued removal from the home and the reasons those efforts failed are clearly evident from the record. Consequently, we find A.W.'s argument that the trial court failed to properly articulate the Agency's efforts to be without merit.

{¶23} We, likewise, find Isaac's contention that the trial court erred by finding that the Agency employed reasonable efforts to be unavailing. The crux of Isaac's argument is that because the Agency did not specifically require A.W. and

Isaac to engage in joint-counseling sessions as part of the case plan, it did not employ reasonable efforts to prevent A.W.'s continued removal from the home.

{¶24} The record is clear that Isaac made no effort to initiate any kind of contact or visitation with A.W. throughout the pendency of the case, despite the case plan requiring him to do so. Indeed, Altvater testified at the hearing to two separate instances where A.W. and Isaac found themselves in the same location, namely a school play for one of A.W.'s siblings and at the home of Altvater's daughter, and on both occasions Isaac made no attempt to speak to or acknowledge A.W. The caseworker testified to Isaac using derogatory language when speaking about A.W. and calling her a "bitch." Isaac's lack of interest in his daughter was noted by the trial court who observed that throughout the hearing, Isaac refused to even look at A.W. and displayed "contempt" for her.

{¶25} Thus, under the circumstances present here, we do not find that the trial court erred by determining that the Agency engaged in reasonable efforts despite not requiring A.W. and Isaac to engage in joint counseling. Specifically, we note that the child's health and welfare must guide the reasonable efforts. *See* 2151.419(A). A.W.'s health and safety was a paramount concern. Thus, we do not find that forcing A.W. to interact with Isaac in counseling sessions would be in her best interest or reasonable given Isaac's attitude and demonstrated lack of concern for her.

{¶26} Isaac's first and second assignments of error are overruled.

-11-

*Conclusion*

**{¶27}** Having found no error prejudicial to the appellant herein in the particulars assigned and argued, we overrule the assignments of error and affirm the judgment of the Hancock County Court of Common Pleas, Juvenile Division.

***Judgment Affirmed***

**ZIMMERMAN and WILLAMOWSKI, J.J., concur.**

Case No. 5-24-30

# **JUDGMENT ENTRY**

For the reasons stated in the opinion of this Court, the assignments of error are overruled and it is the judgment and order of this Court that the judgment of the trial court is affirmed with costs assessed to Appellant for which judgment is hereby rendered.   The cause is hereby remanded to the trial court for execution of the judgment for costs.

It is further ordered that the Clerk of this Court certify a copy of this Court's judgment entry and opinion to the trial court as the mandate prescribed by App.R. 27; and serve a copy of this Court's judgment entry and opinion on each party to the proceedings and note the date of service in the docket.  See App.R. 30.

 

 

Mark C. Miller, Judge

 

 

William R. Zimmerman, Judge

 

 

John R. Willamowski, Judge

DATED:
/jlm

-13-